70 P.3d 126 (2003)
149 Wash.2d 521
Thomas DAVIS, Petitioner,
v.
MICROSOFT CORPORATION, a Washington Corporation, Respondent.
No. 72250-1.
Supreme Court of Washington, En Banc.
Argued October 17, 2002.
Decided June 5, 2003.
*128 O'Shea Barnard Martin, David Hasbrook, Bellevue, for Petitioner.
Preston Gates & Ellis, Thomas Kelly, Paul Lawrence, Matthew Segal, Jonathan Harrison, Seattle, Preston Gates & Ellis, Donna Mezias, San Francisco, for Respondent.
Mary Roberts, Seattle, Amicus Curiae on Behalf of Wa. Employment Lawyers Ass'n.
*127 OWENS, J.
Thomas Davis sued his employer, Microsoft Corporation, alleging disability discrimination under the Washington Law Against Discrimination, chapter 49.60 RCW (WLAD). Davis argued two theories: first, that the WLAD required Microsoft to alter his job duties to accommodate his disability (hepatitis C infection), which prevented him from working more than 8 hours a day and 40 hours a week; and, second, that Microsoft's efforts to accommodate him by transferring him to another position at the company had been inadequate. At the close of Davis's case, Microsoft moved for judgment as a matter of law under CR 50(a), claiming that Davis's evidence was insufficient to support either theory, but the trial court denied the motion. The trial court also rejected Microsoft's proposed verdict form, which would have required the jury to register its findings as to each element of the two separate theories. The jury returned a general verdict in Davis's favor. The Court of Appeals concluded, however, that the trial court had erred by denying Microsoft's motion for judgment as a matter of law on Davis's first theory. The court thus reversed in part and, in light of the general verdict, remanded the matter for trial on Davis's second theory.
We agree with the Court of Appeals that Davis's evidence failed to establish that he could perform the essential functions of his job by working a regular 40-hour week. We likewise agree that Davis's evidence at trial was nevertheless sufficient to withstand Microsoft's motion for judgment as a matter of law on his second theory, accommodation by reassignment. Finally, because the jury may have based its verdict entirely on Davis's invalidated first theory and because Microsoft had proposed a special verdict form that would have prevented any uncertainty as to the jury's findings on the separate theories, we hold that remand is necessary for trial on the second theory alone.

FACTS
Davis began working for Microsoft in 1987. He became a systems engineer in the Original Equipment Manufacturer (OEM) group in 1992 and remained in that position until August 23, 1997. Systems engineers serve large customers, such as computer manufacturers Compaq, Dell, and IBM. Davis himself was responsible for the Toshiba account and the larger Gateway account, which occupied more of his time. The customary duties of a Microsoft systems engineer included creating *129 presentations to introduce new products, traveling to the customer's place of business to provide on-site demonstrations and presale support, and responding to unpredictable, sometimes urgent customer problems and requests. To meet their responsibilities, systems engineers regularly worked well more than 40 hours per week, and at times they worked long days under pressure during the setup process. Davis testified that he initially worked approximately 50 hours a week but that, with the planned shipment of Windows 95 and the work thereafter on Microsoft's Internet technology, "[t]hat put me into a category of working 60 to 80 hours a week, weekends and long days, lots of travel, stuff like that." Report of Proceedings (RP) (Oct. 12, 2000) at 48. Carl Gulledge, manager of the OEM group, likewise testified that in 1996-97 systems engineers worked, on average, 60 hours-per-week, and he explained that the position demanded extensive travel and a flexible work schedule.[1]
Davis was diagnosed with hepatitis C in March 1996. He took a six-week medical leave in September 1996, after which his personal physician indicated he could return to work with no restrictions. In May 1997, Davis submitted a new letter from his physician and requested that his hours be reduced to no more than 8 a day and 40 a week. Microsoft immediately told him to limit his hours on a temporary basis while it evaluated the possibility of a long-term accommodation. Davis's supervisor, Jim Nellis, sent Human Resources a description of Davis's job, which was forwarded to Davis's physician with a request that he clarify Davis's restrictions. Davis's physician recognized that travel was a key element of Davis's job and that such travel "does not always lend itself to an eight-hour day." Ex. 4. He explained that the purpose of the time limitations was to permit Davis to get adequate rest.
During the period of temporary accommodation, Microsoft tried two approaches. Initially, Gulledge and Nellis directed Davis to limit his hours, expecting that he would identify "what he could and couldn't get to with his customers in this temporary time frame." RP (Oct. 12, 2000) at 100. But in late July 1997, Davis notified Gulledge that he was unable to manage his two accounts in a regular 40-hour week and suggested that he be permitted to drop one of his accounts. Gulledge immediately removed Davis from the larger Gateway account. For approximately five weeks, Davis was responsible for the Toshiba account alone, which comprised less than 50 percent of his former work load. Gulledge explained that relieving Davis of more than half of his work load was only a temporary solution, since "the fact remains that the time frame by which sales professionals need to engage customers is one that is not structureable" but must be "very flexible" and "responsive" to the customer and sales team. Id. at 113.
On June 27, 1997, Microsoft's Americans with Disabilities Act Committee discussed Davis's work restrictions and agreed that Karen Marcotte in Human Resources would check on the status of open positions with the Product Support Services (PSS) group. The PSS group addressed postsale, technical issues (similar to those a systems engineer addressed presale) and worked with the same OEM customers. The PSS positions tended to be more structured, accommodating a regular workweek and involving fewer *130 urgent customer demands.[2] Additionally, a PSS position would have potentially enabled Davis to maintain his salary and benefits in a PSS position.[3] The Committee decided that, if Davis was not interested in a PSS position, he could either conduct a six-week paid job search or an unpaid six-month search to find another position within the company. On July 2, 1997, Marcotte met with Davis, explained his options, and suggested that he interview for one of the open PSS positions, advice that Nellis and Gulledge later repeated. Davis expressed a lack of interest in the PSS jobs and indicated that he wanted to remain a systems engineer. On July 10, 1997, Marcotte sent Davis an e-mail message urging him to consider the PSS position, but Davis did not apply.
Ultimately, because Davis did not choose between the six-week or six-month job search that Microsoft had offered, the company elected the latter option for him. From August 23, 1997, until February 23, 1998, Davis had access to the Microsoft job database from his home and from an office at work, and (as Davis had been informed in writing) Janece Clement, an internal resource specialist, was available to assist with his search. When Davis failed to contact Clement or Marcotte during the first four months of his job search, Clement attempted to contact him by leaving voice- and e-mail messages. Three weeks later, Davis responded with his resume and ultimately agreed to meet with Clement in late January 1998. According to Clement, Davis expressed little or no interest in her suggestions; the only position he asked about was a systems engineer position, which (as Clement told him) still could not accommodate his limited work hours. Basically, Davis disagreed with Clement's approach: whereas she believed that the better first step was to place Davis's skill set in front of managers before asking whether they could limit the job to 8-hour days and 40-hour weeks, Davis did not believe he needed to show any interest in a job or contact the job's hiring manager unless Clement could tell him definitively beforehand that the job would accommodate his medical restriction, permitting him to work a regular 40-hour week. Among the jobs that Clement suggested to Davis in 1998 were positions in the PSS group, but Davis was no more interested in those jobs than he had been back in July 1997 when the PSS group was first mentioned as a good fit for him. During the six-month period of his assisted job search, Davis went on one unsuccessful informational interview. Davis's employment with Microsoft ended on February 23, 1998.
Having sought no employment elsewhere, Davis filed suit against Microsoft on March 3, 1999. The case went to trial in October 2000 on Davis's two theories under the WLAD. The trial court denied Microsoft's motion for judgment as a matter of law on October 19, 2000. On October 25, 2000, Microsoft proposed a special verdict form that asked the jury to indicate specifically its determination as to each element of the two separate theories, but the trial court rejected that proposal and approved instead a general verdict form; Microsoft timely objected. The jury returned a general verdict for Davis on October 27, 2000, stating in a single sentence that "[w]e, the jury, find for the plaintiff, in the amount of $2,308,839.60." Clerk's Papers (CP) at 1697.
Microsoft appealed. Determining that Microsoft had been entitled to judgment as a matter of law on Davis's first theory, the Court of Appeals reversed in part and remanded the matter for trial on Davis's second theory. Davis v. Microsoft Corp., 109 Wash.App. 884, 37 P.3d 333 (2002). Davis successfully petitioned this court for review, and Microsoft raised an additional issue in its answer.

ISSUES
(1) (Raised by Davis) Did Davis present sufficient evidence at trial to persuade a rational, unbiased person that he could meet *131 the fundamental responsibilities of the systems engineer position if he worked no more than 8 hours per day and 40 hours per week?
(2) (Raised by Microsoft) Was Davis's evidence at trial sufficient to persuade a rational, unbiased person that Microsoft had not taken affirmative steps to assist Davis in finding another job with the company?
(3) (Raised by Davis) Assuming judgment as a matter of law was warranted on only one of Davis's two theories, did the Court of Appeals correctly determine that, in light of the jury's general verdict form, remand was necessary for trial on Davis's second theory?

ANALYSIS
Standard of Review. We review the trial court's denial of Microsoft's motion for judgment as a matter of law de novo, applying the same standard as the trial court. Sing v. John L. Scott, Inc., 134 Wash.2d 24, 29, 948 P.2d 816 (1997); Hill v. BCTI Income Fund-I, 144 Wash.2d 172, 187, 23 P.3d 440 (2001). A motion for judgment as a matter of law must be granted "when, viewing the evidence most favorable to the nonmoving party, the court can say, as a matter of law, there is no substantial evidence or reasonable inference to sustain a verdict for the nonmoving party." Sing, 134 Wash.2d at 29, 948 P.2d 816. The definition of "substantial evidence" has deep roots in our case law:
We have long since held ... that, on a question of fact, before the trier of the fact is warranted in finding the fact established, there must be substantial evidence in its support. This ... mean[s] that a disputed question of fact, by whatever character of evidence it is sought to be proven, must have in its support that character of evidence which would convince an unprejudiced thinking mind of the truth of the fact, before it can be said to be established.
Thomson v. Va. Mason Hosp., 152 Wash. 297, 300-01, 277 P. 691 (1929) (emphasis added); see Hiner v. Bridgestone/Firestone, Inc., 138 Wash.2d 248, 255, 978 P.2d 505 (1999). "Substantial evidence" has likewise been described as evidence "sufficient ... to persuade a fair-minded, rational person of the truth of a declared premise." Helman v. Sacred Heart Hosp., 62 Wash.2d 136, 147, 381 P.2d 605 (1963); see Guijosa v. Wal-Mart Stores, Inc., 144 Wash.2d 907, 915, 32 P.3d 250 (2001). Thus, in reviewing the trial court's denial of Microsoft's CR 50(a) motion for judgment as a matter of law, filed at the close of the plaintiff's case, we must determine whether Davis presented sufficient evidence to persuade a rational, unbiased person (1) that he could fulfill the basic duties of the systems engineer position in a regular 40-hour workweek or (2) that Microsoft had failed to take affirmative steps to enable him to secure another job within the company.[4]
Accommodation in Current Job. The WLAD prohibits an employer from discharging any employee "because of ... the presence of any sensory, mental, or physical disability." RCW 49.60.180(2). As this court set forth in Hill, "[t]o establish a prima facie case of failure to reasonably accommodate a disability ... a plaintiff must show that (1) the employee had a sensory, mental, or physical abnormality that substantially limited his or her ability to perform the job; (2) the employee was qualified to perform the essential functions of the job in question; (3) the employee gave the employer notice of the abnormality and its accompanying substantial limitations; and (4) upon notice, the employer failed to affirmatively adopt measures that were available to the employer and medically necessary to accommodate the abnormality." 144 Wash.2d at 192-93, 23 P.3d 440 (emphasis added).
At issue under Davis's first theory (that Microsoft had failed to reasonably accommodate his desire to remain a systems engineer) *132 was whether Davis had established the second element of his prima facie casethat he could perform "the essential functions" of the systems engineer position. Id. at 193, 23 P.3d 440. Microsoft contended in its motion for judgment as a matter of law that Davis's evidence indisputably showed that flexibility in responding to customers, frequent travel, and the unpredictable, extended hours resulting from those obligations were "essential functions" of the systems engineer position and that Davis's disability limited him to a regular 40-hour workweek. Agreeing with Microsoft, the Court of Appeals determined that the evidence supporting the second element of Davis's prima facie case had been insufficient to persuade a rational, unbiased person that Davis could perform the "essential functions" of the systems engineer position.
The term "essential functions" is derived from the WLAD's federal counterpart, the Americans with Disabilities Act (ADA),[5] and it has been defined in the regulations of the federal Equal Employment Opportunity Commission (EEOC) as follows: "The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires. The term `essential functions' does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1) (2002) (emphasis added); see Grenier v. Cyanamid Plastics, Inc., 70 F.3d 667, 672 (1st Cir.1995) (noting that EEOC regulations interpreting the ADA, while not controlling, constitute "`a body of experience and informed judgment to which courts ... may properly resort for guidance'" (quoting Meritor Sav. Bank v. Vinson, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986))). Washington courts have in fact drawn on the federal definition to instruct juries on the meaning of "essential functions." See, e.g., Herring v. Dep't of Soc. & Health Servs., 81 Wash.App. 1, 27 n. 12, 914 P.2d 67 (1996); Easley v. Sea-Land Serv., Inc., 99 Wash.App. 459, 472, 994 P.2d 271 (2000); CP at 1686 (Jury Instruction 10).
Interpreting the term "essential functions" as "fundamental job duties" is helpful. Properly understood, an "essential function" is a job duty that is fundamental, basic, necessary, and indispensable to filling a particular position, as opposed to a marginal duty divorced from the essence or substance of the job. See WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 777 ("essential" adj. 1d and 2a) (1976). Additionally, job duties are aptly defined as "obligatory tasks, conduct, service, or functions enjoined by order or usage according to rank, occupation, or profession." Id. at 705 ("duty" n. 2a). The term "functions" (or "job duties") cannot be construed simply as "tasks"; rather, the term "essential functions" must refer not only to the tasks and activities that are indispensable to the job, but also to the "conduct" and "service" required of the employee. Id. Consequently, as federal case law shows, job presence or attendance may indeed be an essential job function. See Fahn v. Cowlitz County, 93 Wash.2d 368, 375-76, 610 P.2d 857 (1980) (holding that Washington courts may permissibly look to federal cases for guidance in construing analogous federal statutes). For example, in Davis v. Fla. Power & Light Co., 205 F.3d 1301, 1306 (11th Cir.2000), the Eleventh Circuit criticized the EEOC for "narrowly equat[ing] `function' with task" and explained that overtime work in some jobs "is akin to job presence, which has been held to be an essential function of a job." Id. (citing, inter alia, Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co., 201 F.3d 894, 900 (7th Cir.2000) (concluding that "regular and timely attendance is an essential function of the tool and die maker position")); Tyndall v. Nat'l Educ. Ctrs. Inc. of Cal., 31 F.3d 209, 213 (4th Cir.1994) (holding that ADA offered no protection for employee unable to meet attendance requirements of a university teacher).
Given the definition of "essential functions," as that term is used in the second element of a plaintiff's prima facie case, Washington law does not require an employer *133 to eliminate such a job duty. Requiring elimination of an indispensable task or role would be tantamount to altering the very nature or substance of the job. See Pulcino v. Fed. Express Corp., 141 Wash.2d 629, 644, 9 P.3d 787 (2000) (stating that "[a]n employer,... is not required ... to create a new position, to alter the fundamental nature of the job, or to eliminate or reassign essential job functions."). Requiring such an alteration would effectively nullify the second element of an employee's prima facie case-proof that he or she "was qualified to perform the essential functions of the job." Hill, 144 Wash.2d at 193, 23 P.3d 440. Thus, not surprisingly, this court has previously stated that "an employer may discharge a handicapped employee who is unable to perform an essential function of the job, without attempting to accommodate that deficiency." Clarke v. Shoreline Sch. Dist. No. 412, 106 Wash.2d 102, 119, 720 P.2d 793 (1986) (emphasis added) (determining that plaintiff's vision and hearing limitations made him incapable of performing essential job function of maintaining classroom discipline and safety).
We agree with the conclusion of the Court of Appeals that Microsoft was entitled to judgment as a matter of law on Davis's first theory (failure to accommodate Davis in his current job). The evidence was undisputed that Microsoft's systems engineers worked a varying number of hours per day due to unpredictable customer demands, that frequent out-of-state travel was necessary to serve their customers and advance the company's selling objectives, and that consequently they worked on average well more than 40 hours per week. It would be misleading to view the flexible availability, frequent travel, and extended hours as discrete job requirements. Plainly, they are interrelated aspects of the systems engineer position that, taken together, constitute an essential function of the systems engineer positionthat is, a type of job presence and service that is indispensable to being a Microsoft systems engineer.[6]See Davis, 205 F.3d at 1304 (holding that utility company's "aggressive same-day connect and reconnect policy" made overtime an essential function for connect and disconnect employees); see also Tardie v. Rehab. Hosp. of R.I., 168 F.3d 538 (1st Cir.1999) (concluding that overtime was essential function of job of human resource director, who dealt with issues beyond regular nine-to-five workday and frequently had to be present for portions of the hospital's three daily work shifts). Because Davis's disability limited him to a structured workweek of no more than 40 hours per week and 8 hours per day, he was unable to continue providing the job presence and service essential to the systems engineer position. Davis's assertion that he adequately serviced the smaller Toshiba account during the temporary accommodation period of four to six weeks cannot persuade an "unprejudiced thinking mind" that he could perform the essential functions of his systems engineer position. Thomson, 152 Wash. at 301, 277 P. 691. His performance during the temporary accommodation period showed only that, for a very limited period of time, he was able to do less than half of his assigned work without adverse results for the company. In effect, what Davis asks this court to do is redefine for Microsoft its systems engineer position; but just as the WLAD does not authorize Davis or this court to tell Microsoft how to set its selling objectives and customer service goals, the WLAD does not permit Davis or this court to tell Microsoft how to organize its work force and structure individual jobs to meet those targets. In sum, we conclude that Microsoft required its systems engineers to work long, unpredictable hours at the home office and on the road. As a matter of law, Davis failed to establish the second element *134 of his prima facie casethat he "was qualified to perform the essential functions of the job in question." Hill, 144 Wash.2d at 193, 23 P.3d 440. We thus affirm the decision of the Court of Appeals on this issue.
Accommodation by Reassignment. Microsoft maintains that it was entitled to judgment as a matter of law on Davis's second theory of liabilitythat Microsoft had failed to accommodate Davis by transferring him to another position. Pulcino, 141 Wash.2d at 643, 9 P.3d 787 (stating that "[r]eassignment is one method of accommodation."). As this court stated in Goodman v. Boeing Co., 127 Wash.2d 401, 408-09, 899 P.2d 1265 (1995), "[r]easonable accommodation... envisions an exchange between employer and employee where each seeks and shares information to achieve the best match between the employee's capabilities and available positions." The employer must take affirmative steps to assist the employee in the internal job search by determining the extent of the employee's disability, by inviting the employee to receive personal help from the employer's personnel office, and by sharing with the employee all job openings in the company. See Dean v. Mun. of Metro. Seattle, 104 Wash.2d 627, 636-39, 708 P.2d 393 (1985); see also Sharpe v. Am. Tel. & Tel. Co., 66 F.3d 1045, 1050-51 (9th Cir.1995) (citing Dean, 104 Wash.2d at 639, 708 P.2d 393) (concluding that AT & T had "indisputably" met its duty by seeking clarification of Sharpe's limitations, providing access to the company's computerized job database, and assigning personnel to assist in internal job search); Staub v. Boeing Co., 919 F.Supp. 366, 370-71 (W.D.Wash.1996) (citing Dean, 104 Wash.2d 627, 708 P.2d 393) (determining Boeing reasonably accommodated Staub by "conduct[ing] an organized internal search for job openings ... and appoint[ing] a vocational counselor to assist him"); Griffith v. Boise Cascade, Inc., 111 Wash.App. 436, 444, 45 P.3d 589 (2002) (quoting Sharpe with approval). The employee's reciprocal duties include informing the employer of his qualifications, "applying for all jobs which might fit his abilities," and "accepting reasonably compensatory work he could perform." Dean, 104 Wash.2d at 637-38, 708 P.2d 393; Griffith, 111 Wash.App. at 444, 45 P.3d 589 (concluding that "Boise Cascade did all that was required" when it offered to reassign employee to a compatible position).
Microsoft argued in its motion for judgment as a matter of law that Davis's evidence could not have persuaded a rational, unbiased person that the company had failed to take affirmative steps to assist Davis in the reassignment process. Microsoft is certainly correct in asserting that it took a number of positive steps to assist Davis. Microsoft solicited information from Davis's physician to determine the extent of Davis's disability, gave him six months to conduct his in-house job search, provided him with office space and immediate access to Microsoft's complete computerized job databank, and assigned him an internal resource specialist, Janece Clement, who initiated contact with him and attempted to provide personal assistance in his job search. While Davis does not deny that Microsoft took those steps, he claims that those efforts did not amount to reasonable accommodation in the reassignment process, since Clement did not predetermine that the suggested job openings would be compatible with his restriction to a regular 40-hour workweek. In his view, the company was asking him to embark on a snark hunt. From Clement's perspective, however, discretion was the better part of valor: she favored having Davis put his skill set in front of the hiring managers before asking whether they could limit a potentially suitable job to 8-hour days and 4-hour weeks. It was, in fact, Davis's particular skills and experience that prompted Gulledge and Clement to encourage Davis to pursue a PSS position, and Microsoft produced evidence that, had Davis applied for such a position, the job could have accommodated his medical disability.
We believe that Davis's concerns about the reasonableness of Clement's approach are at least sound enough to resist Microsoft's motion for judgment as a matter of law. Similarly, we decline to conclude, as the Court of Appeals appears to have done, that Clement's strategy amounted to a failure to accommodate Davis in the reassignment process. To take either position as a matter of lawi.e., to say that access to all company job listings was enough or to say that Microsoft *135 was obligated to find an exact match before Davis had any duty to follow up-would be unwise. The reasonableness of any employer's approach will depend on a number of factors, such as the size of the employer and its database of open jobs, the nature of the job descriptions themselves (whether highly detailed or sketchy), the level of involvement of the company's job counselor, and the advisability of disclosing the disability to the hiring supervisors prior to (or after) an initial interview. In sum, the fact-finder must determine whether Microsoft's efforts were reasonably calculated to assist Davis in finding an alternative position within the company. We affirm the conclusion of the Court of Appeals that Microsoft's motion for judgment as a matter of law on Davis's second theory was properly denied.
Validity of General Verdict. From the jury's general verdict in Davis's favor, one possible inference is that the jury found that Davis had proved only the first theory. Because the jury may have based its verdict solely on the invalidated theory, the Court of Appeals concluded that remand was necessary for trial on the second theory. That conclusion is consistent with prior appellate decisions in Washington. Easley, 99 Wash.App. at 472, 994 P.2d 271 ("uncertainty" as to basis for jury's defense verdict "is fatal to the verdict" and necessitates remand); Erwin v. Roundup Corp., 110 Wash. App. 308, 317, 40 P.3d 675 (2002) ("uncertainty as to the basis for the jury's [defense] verdict requires vacation of the judgment and remand for new trial"). Moreover, the principle is well grounded in federal case law. See Maryland v. Baldwin, 112 U.S. 490, 5 S.Ct. 278, 28 L.Ed. 822 (1884) (vacating general verdict for defense after one of its multiple defenses was found to be invalid); Wilmington Star Mining Co. v. Fulton, 205 U.S. 60, 79, 27 S.Ct. 412, 51 L.Ed. 708 (1907) (vacating general verdict for plaintiff when one of eight theories was invalidated). Under the so-called Baldwin principle, remand is mandatory because it is "simply improper for an appellate body to attempt to divine the defense or theory upon which the jury ha[s] based its decision." Ryan Patrick Phair, Appellate Review of Multi-Claim General Verdicts: The Life and Premature Death of the Baldwin Principle, 4 J.APP. PRAC. & PROCESS 89, 94 (2002); see Elizabeth Cain Moore, General Verdicts in Multi-Claim Litigation, 21 MEMPHIS ST. U.L.REV. 705 (1991).
We conclude that, in cases such as the present one, where a general verdict is rendered in a multitheory case and one of the theories is later invalidated, remand must be granted if the defendant proposed a clarifying special verdict form.[7] To rule otherwise would be to give the plaintiff the benefit of the uncertainty that the defense actively sought to prevent. Because Microsoft proposed a special verdict form that would have eliminated the uncertainty arising from the jury's use of the general verdict form, remand is necessary for trial on Davis's second theory of liability.

CONCLUSION
We agree with the Court of Appeals that Davis's evidence at trial was insufficient to persuade a rational, unbiased person that he could perform the essential functions of his systems engineer position by working no more than 8 hours per day and 40 hours per week. We also agree that the trial court properly denied Microsoft's motion for judgment as a matter of law on Davis's second theory, accommodation by reassignment. Finally, because the jury's verdict may have rested entirely on Davis's invalidated first theory and because Microsoft had sought to eliminate any uncertainty by proposing a special verdict form, we agree with the Court of Appeals that remand is necessary for trial on Davis's second theory alone.
The decision of the Court of Appeals is affirmed.
*136 WE CONCUR: ALEXANDER, C.J., SANDERS, BRIDGE, JJ., SMITH, J. Pro Tem.
MADSEN, J., concurring/dissenting.
I agree with the majority that Thomas Davis's claim that the Washington Law Against Discrimination (WLAD) required Microsoft to alter his job duties to accommodate his disability must fail as a matter of law. Davis failed to establish the second element of his prima facie casethat he was qualified to perform the essential functions of the job in question. I write separately, however, because I would base my decision on narrower grounds. Additionally, I write because the majority does not address the court's instructions on Davis's second theory of liabilitythat Microsoft failed to accommodate Davis by failing to transfer him to another position. The instructions on this theory misstated the law and denied Microsoft the opportunity to argue its position.

DISCUSSION
Instead of focusing on job presence, as the majority does, I would find that flexibility in responding to customers and frequent travel were "essential functions" of the position and that long hours and job presence were a by-product of these functions. Davis's limitation to an 8-hour workday and a 40-hour workweek made it impossible for him to perform the frequent travel and have the flexibility to respond to customers' needs. These grounds alone are sufficient and it is not necessary to include job presence or overtime as essential functions in and of themselves.
The dissent cites the example of snowplow operators and emergency rescue team members as support for its position that long hours must be related to a specific requirement of the work performed. Dissent at 141. The dissent states that plowing snow and responding to emergencies are essential functions of these jobs, but working 60 to 80 hours per week would not be an essential function when there was no snow and no emergency. Dissent at 141. I agree. However, snowplow operators and emergency workers must have the flexibility and ability to work extremely long days or weeks when snowstorms or emergencies do happen. This ability would be an essential function of those particular jobs. Similarly, the systems engineer position at Microsoft requires the flexibility and ability to respond to customer emergencies which may occur in the far reaches of the globe. Davis had neither the flexibility nor the ability to perform these duties.
Davis's manager, Carl Gulledge, testified that he attempted to make the position fit Davis's requirements, but was unable to do so.
[I]n the end, I couldn't overcome the inherent nature of the job and that being that the job calls for being flexible enough to respond to customer needs and to those needs of the sales team. On urgent issues, in short order there just wasn't a way to encapsulate this type of job and maintain a level of satisfaction with our customers and with our sales group.
Report of Proceedings (RP) (Oct. 12, 2000) at 82. Furthermore, Davis's testimony that he performed his job satisfactorily when he was given a reduced workload as a temporary accommodation is not proof that he could perform the essential functions. Majority at 133. The fact that during that short period of time an emergency did not occur does not indicate an ability to respond to possible future emergencies.
Even with a dramatic reduction in load by having a single customer, the fact remains that the time frame by which sales professionals need to engage customers is one that is not structureable. It needs to be very flexible. It needs to be responsive.
RP (Oct. 12, 2000) at 113.
While I do not disagree with the majority or dissent that there are situations where job presence or extended hours may be essential functions of some employment, those factors do not need to be relied upon here. Davis did not have the flexibility to respond to customer's demands or to perform the frequent travel. Therefore judgment as a matter of law is appropriate because he could not perform the essential functions of the position.
*137 I also have grave concerns about the court's instructions on Davis's theory that Microsoft failed to accommodate his disability by failing to transfer him to a different position. Specifically, jury instruction 13 misstates the duty of the employee to apply for potential jobs and together with instruction 8 misstates the appropriate affirmative steps an employer must take to help an employee find an alternative position within the company.
"Jury instructions must be considered in their entirety. They are sufficient if they permit each party to argue his theory of the case, are not misleading, and when read as a whole, properly inform the jury of the applicable law." Dean v. Mun. of Metro. Seattle, 104 Wash.2d 627, 634, 708 P.2d 393 (1985) (citing Brown v. Spokane County Fire Protec. Dist No. 1, 100 Wash.2d 188, 194, 668 P.2d 571 (1983)). The jury instructions in this case are in error because they allow Davis to argue and succeed on a theory which is not supported by the applicable law, while preventing Microsoft from arguing a valid theory of the case.
Jury instruction 13 states in part:
The employee has a corresponding duty to reasonably cooperate with the employer in the search for other suitable work by making the employer aware of his qualifications, by applying for all jobs for which he was qualified and which could reasonably accommodate his disability and by accepting reasonably compensatory work he could perform.
Clerk's Papers (CP) at 1689 (emphasis added). The language of this instruction indicates that an employee is required to apply for a job only after it is affirmatively determined both that the employee is qualified for the position and that the position will accommodate the disability. This is not an accurate statement of Washington law on the duty of an employee to apply for potential jobs.
Dean is the seminal case in Washington pertaining to the duties and actions required by employers and employees in handicap discrimination cases. In Dean, this court stated:
It was correspondingly the duty of [the employee] to cooperate with the employer in the hunt for other suitable work by making the employer aware of his qualifications, by applying for all jobs which might fit his abilities and by accepting reasonably compensatory work he could perform.
104 Wash.2d at 637-38, 708 P.2d 393 (emphasis added). The difference between the language in Dean and jury instruction 13 may at first blush seem slight. However, in Mr. Davis's case it is outcome determinative. Davis's sole point of contention is that Microsoft did not make a definitive determination beforehand that potential job openings would in fact accommodate him. RP (Oct. 23, 2000) at 45-49 (Davis would not cooperate by expressing interest in a job or contacting the hiring managers unless Clement could tell him definitively beforehand that the jobs would accommodate his medical restriction). Davis contends that he had no duty to interview until Microsoft made this definitive determination. Microsoft counters that Davis has a coexisting duty to participate in the job search and apply for all jobs which might fit his abilities.[1]
The word "might" is used to indicate "less possibility or probability than may." Webster's Third New International Dictionary 1432 (1993). By using the phrase "might fit his abilities," Dean places an affirmative duty on the employee to apply for all jobs which have even a weak possibility or probability of being able to fit his abilities. Dean, 104 Wash.2d at 638, 708 P.2d 393; see also Molloy v. City of Bellevue, 71 Wash.App. 382, *138 391, 859 P.2d 613 (1993) (employee failed in duty by refusing job that may have accommodated him, even though it only paid half of salary). Washington courts also look to federal discrimination law to interpret this State's own discrimination law. Clarke v. Shoreline Sch. Dist. No. 412, 106 Wash.2d 102, 118, 720 P.2d 793 (1986). Federal law is in accord with Dean. See Mengine v. Runyon, 114 F.3d 415 (3d Cir.1997) (employee failed to fulfill duty by not interviewing for four job openings, despite his contention that the jobs did not best fit his physical limitations).[2]
Jury instruction 13 misstates the duty of an employee to interview, thus preventing Microsoft the opportunity to argue its theory that Davis had not fulfilled his burden in the accommodation process. Conversely, it allowed Davis to successfully argue his theory that the duty to interview is not triggered until the company makes a definitive determination that the job will in fact accommodate his disability. This theory is not supported by Washington law. Rather, as Microsoft argues, it had the duty to identify potential jobs which might fit Davis's qualifications and might accommodate his disability, not a duty to identify only positions it could guarantee would accommodate.[3]
Dean provides that to make a prima facia case of discrimination an employee must prove that "the employer failed to take affirmative measures to make known such job opportunities to the employee and to determine whether the employee was in fact qualified for those positions." Dean, 104 Wash.2d at 639, 708 P.2d 393 (emphasis added). Nowhere in Dean does the court require an employer to make a definitive determination beforehand that potential job openings will in fact accommodate the disability. Id. at 636-39, 708 P.2d 393. However, both jury instruction 8 and jury instruction 13 imply that this definitive determination is a requirement of the employer by adding the phrase: "that could accommodate his disability."[4]Dean does state that "[i]t was the duty of [the employer] to reasonably accommodate [the employee] by informing him of job openings for which he might be qualified" and that correspondingly it was "the duty of [the employee] to cooperate with the employer in the hunt for other suitable work by ... applying for all jobs which might fit his abilities." Id. at 637-38, 708 P.2d 393. However, Dean only requires that potential jobs identified by the employer have the possibility or potential for accommodation. Id. at 637, 708 P.2d 393.
Even if an employee establishes a prima facia case of discrimination, the United States Supreme Court has long held "that the employee's prima facie case of discrimination will be rebutted if the employer articulates lawful reasons for the action; that is, *139 to satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 257, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Microsoft stated very clearly its reason for not making a definitive determination whether a job would in fact accommodate Davis's disability. Microsoft concluded that the best chance for success would come by having Davis interview for jobs that might fit his abilities, before informing the managers of his disability. By doing this, it was Microsoft's contention that Davis would be able to impress the managers with his skill set, making accommodation more likely. RP (Oct. 23, 2000) at 45-46.
The language of the jury instructions incorrectly prevented Microsoft from arguing its theory that once it had identified potential positions that the employee might be qualified for, it could not determine if the employee was "in fact qualified for those positions" without the cooperation of the employee. The approach advocated by Davis and supported by the jury instructions would virtually eliminate the need for an employee to interview and assist in the job search, instead placing the entire burden of locating and investigating jobs on the employer. This theory contravenes the applicable law.
In Dean, this court advocated a process where employer and employee work together to find an accommodation which would fit with the employee's disability. 104 Wash.2d at 638, 708 P.2d 393. This approach is strongly reinforced by subsequent Washington and federal decisions. See Goodman v. Boeing Co., 127 Wash.2d 401, 408, 899 P.2d 1265 (1995) (reasonable accommodation thus envisions an exchange between employer and employee where each seeks and shares information to achieve the best match between the employee's capabilities and available positions); Beck v. Univ. of Wis. Bd. of Regents, 75 F.3d 1130, 1135 (7th Cir.1996) (Americans with Disabilities Act regulations envision an interactive process that requires participation by both parties); Mengine v. Runyon, 114 F.3d 415, 420 (3d Cir.1997) ("We agree that both parties have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith.... Simply put, a disabled employee seeking reassignment will be best served by employer and employee working together to identify suitable positions."); Hunt-Golliday v. Metro. Water Reclamation Dist. of Greater Chi., 104 F.3d 1004, 1012 (7th Cir.1997) (determining what specific actions should be taken by an employer requires an interactive process involving participation by both sides); Shiring v. Runyon, 90 F.3d 827, 832 (3d Cir.1996) (employee has the duty to identify a vacant, funded position whose essential functions he is capable of performing).
Dean holds that the law against discrimination "requires that the employer affirmatively assist the employee who becomes handicapped on the job." 104 Wash.2d at 639, 708 P.2d 393. Microsoft asserts, and Davis concedes, that it took the following positive steps to assist Davis: (1) solicited information from Davis's physician to determine the extent of Davis's disability; (2) gave Davis six months to conduct his in-house job search; (3) provided Davis with office space and immediate access to Microsoft's complete computerized job databank; and (4) assigned him an internal resource specialist, Janece Clement, who initiated contact with him and attempted to provide personal assistance in his job search. Furthermore, after it was determined that Davis could not perform the essential functions of his current job, Microsoft's Americans with Disabilities Act Committee considered the situation and decided that the position in the Product Support Services (PSS) group may be a good fit for Davis's situation. RP (Oct. 17, 2000) at 95-104. Davis was subsequently encouraged to apply for the job by a member of Human Resources, his supervisor, Jim Nellis, and the Original Equipment Manufacturer (OEM) group manager, Carl Gulledge. Id. at 115-16; RP (Oct. 12, 2000) at 120-22. Nellis and Gulledge both believed that a PSS position would be appropriate for Davis because the PSS group worked with the same customers as OEM on similar technical issues and the positions in PSS were more structured and accommodating to a regular work schedule. Id. However, Davis expressed *140 distaste for the PSS jobs, declined to apply and indicated that he wanted to remain a systems engineer. Id.
Despite all of these efforts, Davis contends that Microsoft still failed in its duty to "affirmatively assist the employee." This contention is not in accord with Washington law on the duty of employers in disability discrimination cases. See, e.g., Dean, 104 Wash.2d at 638-39, 708 P.2d 393 (employer failed to make reasonable accommodations by not determining the extent of the employee's disability, not calling him into the office to assist him in applying for other positions, not giving special attention from the personnel office, taking no affirmative steps to help him find another position, not informing him of all job openings, and treating him as any other applicant); Sharpe v. Am. Tel. & Tel. Co., 66 F.3d 1045, 1051 (9th Cir.1995) (concluding that employer had "indisputably" met its duty by seeking clarification of employee's limitations, providing access to the company's computerized job database, and assigning personnel to assist in internal job search); Griffith v. Boise Cascade, Inc., 111 Wash.App. 436, 444, 45 P.3d 589 (2002) (employee did all that was required when it offered to reassign employee to a compatible position); Goodman, 127 Wash.2d 401, 899 P.2d 1265 (employer did not reasonably accommodate because it failed to affirmatively ascertain the nature and extent of employee's disability); Clarke, 106 Wash.2d at 121-22, 720 P.2d 793 (concluding the employer took appropriate affirmative steps by considering employee for other teaching jobs within the district); Staub v. Boeing Co., 919 F.Supp. 366, 370-71 (W.D.Wash.1996) (citing Dean, 104 Wash.2d 627, 708 P.2d 393) (determining employer reasonably accommodated employee by conducting organized internal search for job openings and appointing a vocational counselor to assist him); Molloy, 71 Wash. App. at 391-92, 859 P.2d 613 (concluding employer reasonably accommodated employee by advising him of available nonpolice employment); Dedman v. Wash. Personnel Appeals Bd., 98 Wash.App. 471, 485-86, 989 P.2d 1214 (1999) (concluding that employer reasonably accommodated employee by reassigning her to a position that was a demotion); Curtis v. Sec. Bank of Wash., 69 Wash. App. 12, 19, 847 P.2d 507 (1993) (determining the employer failed to take appropriate affirmative steps by not encouraging the employee to apply for jobs, not assisting her in doing so, withholding pertinent information about future jobs and treating her as any other employee); Holland v. Boeing Co., 90 Wash.2d 384, 583 P.2d 621 (1978) (concluding that arbitrarily removing handicapped employee from current position and placing him in a position where, because of his handicap, he was destined to fail, constituted unfair practice in violation of discrimination statute).

CONCLUSION
The jury instructions in this case misstate the law pertaining to the reciprocal duties of employers and employees in accommodating disabilities and prevented Microsoft from legitimately arguing its theory to the jury. Additionally the instructions allowed Davis to succeed on a theory that conflicts with prior decisions regarding disability discrimination. For this reason I agree with the majority that the matter must be remanded for a new trial. I also agree with the majority that Davis's claim that the WLAD required Microsoft to alter his job duties to accommodate his disability must fail as a matter of law because Davis could not meet the essential functions of the jobfrequent travel and flexibility to meet customer needs.
CHAMBERS, J., dissenting.
The majority has confused "work load" with "essential function." Washington's Law Against Discrimination, chapter 49.60 RCW, requires an employer to reasonably accommodate the limitations of a disabled employee unless the employer can demonstrate that such accommodation would result in an undue hardship to the employer. Pulcino v. Fed. Express Corp., 141 Wash.2d 629, 639, 9 P.3d 787 (2000). To allow employers as a matter of law to define such heavy work loads to be an "essential function" of the job such that the work can only be accomplished by working excessive hours would eviscerate our statutory protection of disabled employees. Unlike the majority, I believe that whether a 60 to 80 hour workweek is an *141 essential function of this job is a question of fact, best left to the jury. Therefore, I respectfully dissent.
It should be a factual, not legal, question whether long hours are an essential function of a job. Whether an employment condition requiring 60 to 80 hours per week is an essential function of a particular job, or whether an employer is merely increasing profits at the detriment of employees like Thomas Davis, is a question of fact. Stated another way, whether the employer is merely asking its employee to do the work of two people or whether factors such as fluctuations in work load, travel, the need for on call availability, and other similar factors require consistent long hours is best left for the trier of fact.
I agree with the majority on many points.[1] I agree that extended hours may be an essential function of a particular job. Majority at 132 (citing Davis v. Fla. Power & Light Co., 205 F.3d 1301, 1306 (11th Cir.2000) (hereinafter FP & L)) (holding that four hours per week average overtime could be an essential function of the job as an electricity lineman at least when employee agreed to overtime as a condition of employment). However, an employer's "culture" of requiring long hours of employment, standing alone, is never an essential element of a job. The long hours must be related to specific requirement of the work performed, not the other way around. For example, snowplow operators and emergency rescue team members may have to work very long hours during snowstorms and emergencies. Plowing snow and responding to emergencies are essential functions of these jobs. It would not be an essential function of these jobs to require snowplow operators and emergency rescue workers to work 60 to 80 hours per week when there was no snow and no emergency.[2]
I agree with the majority that the question before us turns on whether Davis presented sufficient evidence that he was "qualified to perform the essential functions of the job in question." Majority at 131 (quoting Hill v. BCTI Income Fund-I, 144 Wash.2d 172, 193, 23 P.3d 440 (2001) (some emphasis omitted)); see also 6A WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 330.33, at 333 (4th ed. 2002) (WPI).[3] And I agree with the majority that this court is not the appropriate forum for determining the essential functions of a Microsoft systems engineer. Majority at 134; accord Pulcino, 141 Wash.2d at 644, 9 P.3d 787. But judgment as a matter of law should "not be granted unless the court can say, as a matter of law, that there is neither evidence nor reasonable inference from the evidence sufficient to sustain the verdict." Pritchett v. City of Seattle, 53 Wash.2d 521, 522, 335 P.2d 31 (1959). Such a motion "admits the truth of the opponent's evidence and all inferences that can be reasonably drawn therefrom, and requires the evidence be interpreted most strongly against the moving party and in the light most favorable to the opponent." Hill, 144 Wash.2d at 187-88, 23 P.3d 440 (quoting Aluminum Co. of Am. v. Aetna Cas. & Sur., 140 Wash.2d 517, 529, 998 P.2d 856 (2000) (quoting Goodman v. Goodman, 128 Wash.2d 366, 371, 907 P.2d 290 (1995))). Davis presented sufficient evidence to defeat such a motion. Applying the proper analytical framework, we are left with a question of fact, not law.[4]

*142 ESSENTIAL FUNCTIONS
The Washington Law Against Discrimination prohibits discrimination against disabled employees. RCW 49.60.030, .180. "The right to be free from discrimination because of ... physical disability ... is recognized as and declared to be a civil right." RCW 49.60.030(1). Violation of this right is answerable in tort. See, e.g., Pulcino, 141 Wash.2d 629, 9 P.3d 787.
Davis has the burden of establishing that he is capable of performing the essential functions of the job of systems engineer. Hill, 144 Wash.2d at 193, 23 P.3d 440. It is undisputed that Davis is a qualified systems engineer. The only question is whether an essential function of the job of a systems engineer is a 60 to 80 hour workweek. This is a question of first impression in Washington. Neither the legislature nor this court has yet established a standard for determining which job functions are essential functions. This is hardly surprising; whether a specific function is an essential function is a question of fact resisting easy codification.
"Whether a function is essential is evaluated on a case-by-case basis by examining a number of factors." FP & L, 205 F.3d at 1305. In Washington, it is entrusted to the fact finder. Cf. WPI 330.33, at 333. Factors to assist the fact finder in this determination have been articulated. The Equal Employment Opportunities Commission has suggested a flexible standard, considering several factors.[5] However, the various tests as articulated are not especially helpful, as they are generally couched toward determining if a task, duty, or discrete work condition is an essential function, not whether a structural requirement, like a regular workweek of 60 to 80 hours, is an essential function.
The Court of Appeals has been faced with related questions several times. In one case, the issue was whether the personnel appeals board properly found that the ability to restrain an inmate was an essential function of the job of a correctional officer. Noting that the ability to restrain an inmate was part of the official job description and was articulated in the collective bargaining agreement, and that in an emergency she might be called upon to perform the task, the court affirmed the personnel appeals board that it was an essential function. Dedman v. Pers. Appeals Bd., 98 Wash.App. 471, 479-80, 989 P.2d 1214 (1999). In another case, the Court of Appeals considered whether the ability to take notes of jailhouse interviews was an essential function of a public defender paralegal's job. Noting that the paralegals in that position spent 75 percent to 80 percent of their time on this task, the court found that it was. MacSuga v. Spokane County, 97 Wash. App. 435, 438-39, 983 P.2d 1167 (1999). In a different case, the Court of Appeals effectively found that high stress was not an essential function of a financial services specialist job. See generally Sommer v. Dep't of Soc. & Health Servs., 104 Wash.App. 160, 15 P.3d 664 (2001). Underlying these cases is a fact intensive determination of whether the ability to perform a particular function is essential to the job; a fact intensive determination best left to the finder of fact.

INSTRUCTIONS AND EVIDENCE
The jury was properly instructed on the law. Jury Instruction 8 properly instructed the jury on Davis's burden of proof.[6] Further, *143 Jury Instruction 10 properly defined "essential functions."[7]
Davis began working for Microsoft in 1987 as one of its first systems engineers. In 1992, he became a systems engineer with the original equipment management (OEM) sales group, averaging about 45 to 50 hours work per week. As Windows 95 was about to be introduced, he began working longer hours, averaging 60 to 80 hours per week. However, in the nine years he had been with Microsoft, Davis had never been given an hourly requirement. The written job description for his position never contained an hourly work requirement or requirement to handle more than one account. The only official indication of required work hours was put forth after Davis requested an accommodation.
Moreover, when Davis's supervisor completed a form entitled "Identifying Physical and Mental Demands of a Position," after Davis made his request for an accommodation, the supervisor specifically stated that work hours vary and flexibility is the key. The form provided:
Work hours in this position are cyclical. As a sales position, work hours can expand or contract as situations require. Employees in this position are measured by results achieved and not by hours worked. This can mean more hours for employees working on more difficult objectives or with a difficult account.
Report of Proceedings (Oct. 18, 2000) at 27-28.
When Microsoft provided a reduced work schedule as a temporary accommodation, and Davis began servicing just the Toshiba account, his performance was good. Davis's supervisor testified that there were no complaints about Davis's performance during the time he was servicing the one account, which required "deep technical" expertise. Davis presented evidence that other Microsoft systems engineers now handle only one account. From this, the jury could have inferred that neither the 60 to 80 hour work week nor the handling of two accounts was an essential function of the job.
The majority concludes, as a matter of law, that an "intertwined" essential function of the job of a Microsoft systems engineer is "long hours, flexible availability, and frequent travel." Majority at 133. I note, however, that Davis had no travel restriction. There is evidence he could be sufficiently available to his client had his work been restricted to servicing one account. Given that, the only remaining issue is whether a 60 to 80 hour workweek is an essential job function.[8] *144 There is substantial evidence to support a jury finding that Davis could perform every essential function as a systems engineer with the OEM sales group.

CONCLUSION
The respect accorded the jury is sunk deep into the history and traditions of our state and our nation. WASH CONST. art. I, § 22; U.S. CONST. AMEND. VII. "The credibility of witnesses and the weight to be given to the evidence are matters which rest within the province of the jury; and, even if it were convinced that a wrong verdict had been rendered, this court would not substitute its judgment for that of the jury so long as there was evidence which, if believed, would support the verdict rendered." Burke v. Pepsi-Cola Bottling Co. of Yakima, 64 Wash.2d 244, 246, 391 P.2d 194 (1964). The judicial urge to take questions of fact from the jury must be resisted.
We have upheld the legislature's constitutionally vested power to enact a wage and hour statute; a holding that was upheld by the United States Supreme Court. See Parrish v. W. Coast Hotel Co., 185 Wash. 581, 55 P.2d 1083 (1936); aff'd, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937). This case presents an allied question: whether a requirement to work extensive hours, as a matter of law, should be declared an essential function of a job that may not be modified to accommodate a disability. Given the disputed facts, this is a question best left to the jury. Therefore, I respectfully dissent and would affirm the trial court in its entirety.
JOHNSON and IRELAND, JJ., concur.
NOTES
[1] "[I] [r]ealize ... 55, 60, 65 hours sounds like a lot of time, and it is, but it isn't all time spent at the desk. There is time in the systems engineer's case, ... spent in the labs preparing demos or running tests, and ... oftentimes that is work that needs to be done in a time frame when there aren't meetings and customer obligations at work. So you often find systems engineers working in the evenings. Travel takes a lot of time. These customers don't live in the Seattle area, and we have to go to their places of business. And the time you spend in the air, getting to and from the airport all add up. People also spend a lot of time responding to customers after hours because they live in different time zones. They are working early morning on the east coast or late evening in other parts of the world. These accounts are in fact global customers, and they have businesses all over the planet. So even though we primarily would support them in the U.S., they would have businesses in Europe and Asia that would contact us. So there is an ongoing need to supply and respond to customer requests, and you find at the end of the week to do that well and to drive forward your selling objectives, you are working a lot more than a 9:00-to-5:00 position." RP (Oct. 12, 2000) at 92-93.
[2] At trial, Microsoft engineer Garry Wolfe testified that he had moved into a PSS position in February 1998 that accommodated his need to work no more than a 40-hour week due to his serious heart condition.
[3] As an experienced systems engineer, Davis earned a salary in July 1997 of $74,000, and his stock options were valued at $14-16 million.
[4] Ignoring the procedural reality here, that we are reviewing the defendant's CR 50(a) motion for judgment as a matter of law, the dissent looks beyond the motion to the jury instructions. Dissent at 142. We underscore that we are not reviewing this particular jury's ultimate verdict as to each theory (a review that, in any case, we could not undertake since the general verdict form leaves uncertain the jury's finding as to each theory). Rather, we are determining whether the evidence presented in the plaintiff's case was sufficient to persuade "an unprejudiced thinking mind" of the truth of Davis's two allegations. Thomson, 152 Wash. at 301, 277 P. 691.
[5] "The term `qualified individual with a disability' means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) (emphasis added).
[6] The dissent persistently misstates the issue as whether long hours, without more, may constitute an essential job function. The facts of this case do not present that narrow issue. Here, we consider whether a particular type of job presence, marked by the necessity for frequent travel and for flexibility both within the workday and across the workweek, was essential to the systems engineer position. Microsoft, in fact, never defined an hours-per-week requirement for the job; rather, the company noted that the hours were "cyclical," dependent on changing situations and on the difficulty of particular objectives or accounts. RP (Oct. 18, 2000) at 27-28. Thus, contrary to the dissent's perception, the demands of the systems engineer position are analogous to the burdens facing snowplow operators or utility company linemen. Dissent at 141.
[7] "A number of modern appellate courts have held that an appellant is required to object to a general verdict before he can invoke the Baldwin principle [Maryland v. Baldwin, 112 U.S. 490, 5 S.Ct. 278, 28 L.Ed. 822 (1884)] on appeal.... The Ninth Circuit seems to have the most established waiver rule." Phair, supra, at 122-23 (discussing and quoting McCord v. [Maguire], 873 F.2d 1271, 1274 (9th Cir.1989)).
[1] Microsoft proposed the following jury instruction:

"The disabled employee also has obligations in the accommodation process. An employee must apply for all open positions for which he might be qualified and which might accommodate his disability, and he must accept reasonably compensatory work. If an employer identifies one or more open positions for which the disabled employee may be qualified but the employee fails to apply for the position(s) or fails to accept a position, if offered, then the employer's obligation to reasonably accommodate the disabled employee has been discharged." Clerk's Papers (CP) at 1645 (Def.'s proposed instruction 21).
[2] In Curtis v. Sec. Bank of Wash., 69 Wash.App. 12, 847 P.2d 507 (1993), Division Three of the Washington Court of Appeals found that the failure of an employee to interview for open positions was not fatal to her claim. Id. at 19, 847 P.2d 507. However, the court made clear that the finding was due to the employer's failure to attempt any kind of accommodation and refusal to take positive steps to help the employee. Id.
[3] Microsoft's proposed instruction 8 states in part:

B. In order to prove the alternative claim, Mr. Davis has the burden of proving each of the following elements by a preponderance of the evidence:
(3) That Microsoft failed to take reasonable steps to assist him in identifying one or more other open positions for which he might be qualified and which might accommodate his disability; AND
(4) That he met his obligations to apply for all open positions for which he might be qualified and which might accommodate his disability and to otherwise reasonably cooperate in the search for such position.
CP at 1630-31 (Def. proposed jury instruction 8).
[4] Jury instruction 8 states in part:

"On his claim of discrimination, Plaintiff Davis has the burden of proving each of the following elements by a preponderance of the evidence:
"(2)(b) that Microsoft failed to take reasonable steps, in light of the corresponding duty of the employee, to determine and make known to him another position which was vacant and for which he was qualified and that could accommodate his disability." CP at 1683 (jury instruction 8) (emphasis added). Jury instruction 13 states in part: "The employer must then take reasonable steps to determine and make known to the employee another position which was vacant and for which he was qualified and that could accommodate his disability." CP at 1689 (jury instruction 13) (emphasis added).
[1] I concur with the majority that the jury was properly instructed on Davis's other legal theory. Given that I would affirm the trial court on all points, I do not consider the general verdict matter.
[2] I do, however, agree with the majority that presence is an essential function of some jobs.
[3] Illustrative is the current pattern jury instruction for the burden of proof on reasonable accommodation of a disability. It reads:

Discrimination in employment on the basis of disability is prohibited.
The plaintiff has the burden of proving:
(a) that [he][she] has a disability;
(b) that the employer was aware of the disability;
(c) that [he][she] was able to perform the essential functions of the job in question with reasonable accommodation; and
(d) that the employer failed to reasonably accommodate the plaintiff's disability.
WPI 330.33, at 333.
[4] I disagree with the majority that the "procedural reality" of this case mandates that it be taken from the jury. The procedural reality is that this is a motion for judgment as a matter of law. Thus, Microsoft can only prevail if "`it can be said, as a matter of law, that no evidence or reasonable inferences existed to sustain a verdict for'" Davis. Gurno v. Town of LaConner, 65 Wash.App. 218, 222-23, 828 P.2d 49 (1992) (quoting Bender v. City of Seattle, 99 Wash.2d 582, 587, 664 P.2d 492 (1983)). This is a high standard that Microsoft has not met. Therefore, it was properly given to the jury and a review of the jury instructions is an appropriate judicial exercise before a verdict is reinstated.
[5] Under the federal approach, a court must consider "(1) the employer's judgment as to which functions are essential; (2) written job descriptions; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the employee to perform the function; (5) the terms of a collective bargaining agreement; (6) the work experience of past employees in the job; and (7) the current work experience of employees in similar jobs." Dedman v. Pers. Appeals Bd., 98 Wash.App. 471, 479, 989 P.2d 1214 (1999) (citing with approval 29 C.F.R. § 1630.2(n)(3)).
[6] That jury instruction stated in relevant part:

On his claim of discrimination, Plaintiff Davis has the burden of proving each of the following elements by a preponderance of the evidence:
(A) that he had a disability;
(B) that Defendant Microsoft was aware of the disability; and
(C) either:
(1)(a) that, despite his disability, he was able to perform the essential functions of his job with reasonable accommodation; and (b) that Microsoft failed to reasonably accommodate him in that position.
Clerk's Papers (CP) at 1683 (Jury Instruction 8).
[7] That jury instruction stated:

The term "essential functions" means the fundamental job duties of a position. Essential functions are those that bear more than a marginal relationship to the job.
A job function may be considered essential for any of several reasons, including but not limited to the following:
(1) because the reason the position exists is to perform that function;
(2) because of the limited number of employees available among whom the performance of that job function can be distributed, and/or
(3) because the function may be highly specialized so that a person is hired for his or her expertise to perform that particular function.
The essential functions of a position may be determined by considering such factors as:
(1) the employer's judgment as to what functions of the job are essential;
(2) written job descriptions;
(3) the amount of time spent on the job performing the functions;
(4) the consequences of not requiring the employee to perform the functions;
(5) the past work experience of other employees in the position; and/or
(6) the current work experience of employees in similar positions.
These factors are not intended to be the only factors that you may or should consider.
CP at 1686 (Jury Instruction 10). Compare Dedman, 98 Wash.App. at 479, 989 P.2d 1214.
[8] The Court of Appeals appeared to have found decisive the fact that on site demonstrations could present unforeseen complications that could require long hours. Davis v. Microsoft Corp., 109 Wash.App. 884, 892, 37 P.3d 333 (2002). However, whether occasional long hours would be required is not central to the issue before us; whether regular 60 to 80 hour workweeks, as a matter of law, are an essential function of the job.