# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| LIAM RILEY, | No. 58295-3-II |
| Appellant, | |
| v. | |
| CITY OF TACOMA, a municipal corporation, | UNPUBLISHED OPINION |
| Respondent, | |
| TACOMA FIRE DEPARTMENT, | |
| Defendant. | |

GLASGOW, J.—Liam Riley was a mechanic for the City of Tacoma's fire department. Riley experienced conflict with his coworkers in the fire garage over the distribution of parts and what music the mechanics would listen to while working. The conflicts increased Riley's physical symptoms of anxiety, and he had to be taken to the hospital multiple times for high blood pressure.

Riley sued the City, alleging in part that the City failed to accommodate his disability under the Washington Law Against Discrimination, chapter 49.60 RCW.[1] He also claimed that he experienced a hostile work environment as a result of his disability. The trial court dismissed the hostile work environment claim on summary judgment. The failure to accommodate claim proceeded to trial, and after Riley presented his evidence, the City moved for judgment as a matter of law. The trial court dismissed that claim as well and Riley appeals.

---

[1] Riley also brought claims for intentional infliction of emotional distress and wrongful termination. Riley voluntarily dismissed his claim for intentional infliction of emotional distress, and Riley does not raise any issue regarding dismissal of the wrongful termination claim on appeal.

The trial court properly dismissed the failure to accommodate claim because the undisputed evidence established that Riley failed to cooperate with the City during the interactive process for evaluating Riley's need for accommodation. Despite several clear requests from the City, Riley failed to provide requested medical documentation addressing the nexus between his disability and his ability to perform the essential functions of his job. Riley's lack of cooperation was fatal to his claim. The trial court also properly dismissed the hostile work environment claim because Riley failed to establish more than isolated incidents of hostility and he did not offer any evidence they were a result of his disability. We affirm.

## FACTS

### I. BACKGROUND

A.    Riley's Work for the City and His Medical Conditions

Riley began working for the City of Tacoma as a mechanic for the City's fire department in 2013. He primarily worked on fire department vehicles and equipment in the only fire garage in the City's fire department. Riley repaired fire department vehicles and equipment, including tasks such as welding and fabricating.

Starting in 2013, Riley suffered from numerous health problems, including marked obesity, chronic fatigue, mood swings, irritability, and joint pain. Riley also had high blood pressure for many years before he started working for the City. He sought treatment from multiple physicians and specialists including Dr. Norman Seaholm, who was his physician for at least 12 years. Riley began testosterone injections as part of his treatment.

B.      Riley's Initial Request to the City, His Interpersonal Conflicts, and His Workplace Blood Pressure Spike

In 2018, Riley began to report conflict with his coworkers. Generally, he complained that they did not provide him with parts and supplies in a timely way, and coworkers were rude and disrespectful to him. For example, Riley testified that his coworkers called him the boss's "pet and his golden boy" and said "that [Riley] would get away with everything." 4 Verbatim Rep. of Proc. (VRP) at 245. Riley also testified that one of his coworkers Carol Haeger once raised her hand at him as if she was going to slap him but did not. Riley said another coworker told Riley on multiple occasions he was going to "kick [his] ass." 6 VRP at 712-13. Riley reported that this personal conflict caused him stress and anxiety, and he felt that he needed to get help beyond his direct supervisor, Don Voigt.

In January 2018, Riley texted Chief Patrick McElligott and reported that he was "being illegal[l]y discriminated against." Ex. 108.001. He complained about Haeger not getting parts and supplies for him to be able to do his job. After Riley sent this text, he had a meeting with McElligott and Voigt, where he also complained about arguments over what radio station should be played in the garage. After the meeting, things got better for about six months.

On June 13, 2018, Riley argued with Haeger over auto parts, and he reported that Haeger screamed at him. Riley said that Haeger had purposefully violated garage protocol and placed boxes behind the vehicle he was working on and he ran them over. Fire department personnel checked his blood pressure and reported to him that it was 228 over 140. An ambulance took Riley to the hospital where he had a similarly high blood pressure reading. Riley complained that while he was on the gurney, Haeger looked at him with "hate and disdain." 4 VRP at 254.

C.      Riley's Ongoing Issues with Workplace Conflict and the City's Response

About two weeks after Riley's June 13, 2018, emergency room visit, Seaholm cleared Riley to return to work with no restrictions. The letter from Seaholm noted that work stress played a role in Riley's elevated blood pressure, but medications had gotten his blood pressure under control.

There continued to be conflict among workers in the fire department garage. The City conducted a "Climate Assessment," which is an in-depth internal investigation. Clerk's Papers (CP) at 658. The City concluded that Riley did have personality conflicts with two coworkers. The City found that Riley participated in the conflict. The record confirms that Riley engaged in name-calling, foul language, and physical intimidation of coworkers and supervisors. The City's assessment did not find that anyone's safety was at risk.

Nine months later, in March 2019, Riley again experienced elevated blood pressure at work and was taken to the hospital. Seaholm wrote a letter stating that Riley's blood pressure spike was the result of workplace conflict and noted that Riley was at high risk for stroke. Even so, Seaholm released him to go back to work without restrictions.

D.      Riley's Request for Accommodation and the City's Response

In early April 2019, Riley asked for a workplace accommodation, specifically to be assigned "'*somewhere else in the city that is [a] safe and healthy work environment*.'" Ex. 136.002. The City's Disability and Leave Management Office began an interactive accommodation process with Riley. The City explained that when an employee has experienced a medical condition that impacts their ability to perform the essential functions of their position, they may be entitled to a reasonable accommodation. Examples of reasonable accommodations include restructuring of a

position, changes in work schedule, acquiring or modifying equipment, or, as a last resort, reassignment to an entirely different position. Because the fire garage was the only location where fire mechanics worked, the City could not simply transfer Riley to another location as a fire mechanic. Reassignment to a different position was a possible accommodation, but the City explained that reassignment would be a last resort.

The first step in the interactive process was completion of a medical questionnaire about Riley's disability and whether he could perform the essential functions of his position. The City sent Riley a release that would have allowed his medical providers to communicate directly with the City. Riley never executed this release.

The City then sent Riley the questionnaire for his medical providers to complete. In the meantime, Riley sent the City an email expressly forbidding the City to have contact with his medical providers. In this email, Riley also stated that he was represented by counsel.

In late May 2019, Seaholm and Riley's mental health therapist, Karey Regala, completed the medical questionnaire. Seaholm stated that Riley's anxiety, high blood pressure, and high risk for cardiac events began in 2016, and he anticipated these conditions would last at least another year. He also checked a box stating that limitations would be permanent. Seaholm recited Riley's recent episodes of high blood pressure, warned of a significant risk of a catastrophic cardiac event, and explained that "[c]urrent work conflicts appear to be playing a significant role." Ex. 140.004. Seaholm explained that treatment included medication for blood pressure and anxiety, as well as therapy. When asked what major life activities were affected, Seaholm only listed concentration and focus. Seaholm did not evaluate whether there were any essential functions of Riley's position that Riley could not perform.

Regala also filled out the medical questionnaire. She explained that according to Riley, his anxiety symptoms occurred when he had negative interactions with certain people at work. She checked the box on the questionnaire that stated Riley's restrictions were temporary and explained: "[p]er client report, anxiety and stress, including panic attack episodes[,] would cease if client could perform work duties in a safe and healthy environment." Ex. 140.005. Regala recommended in the questionnaire that, "Riley can perform all job duties necessary provided he be placed in a role where his work environment be deemed safe and healthy, where on a daily basis he doesn't feel threatened or bullied by fellow co-workers." Ex. 140.007.

Neither questionnaire stated Riley could not perform any particular essential function of his position without accommodation. Nor did either questionnaire state that he could not continue to work in the fire garage. These are the only medical questionnaires that Riley ever submitted to the City.

After this, Riley filed a complaint with the United States Equal Employment Opportunity Commission (EEOC). However, the EEOC was unable to conclude that any laws were being violated.

In early June 2019, the City offered Riley a temporary transfer to a different work location, which he accepted. The City explained, "This opportunity is temporary and **is not** being offered as permanent assignment nor is it related to any accommodation process." CP at 718.

Around the same time, the City met with Riley and his union representative to discuss reassignment as a reasonable accommodation. At the meeting, the City explained that additional medical information may be needed. The City followed up in writing by explaining that in order to continue the accommodation process, it would need to obtain information from Riley's medical

providers about the nexus between his conditions and his ability to perform the essential functions of his job.

Immediately following the meeting, Riley emailed the City stating that he wanted to "freeze" the accommodation process until further notice and explaining that he had told his medical providers that he was "terminating the ADA reasonable accommodation process." Ex. 142.001. Riley felt his temporary workplace was safe and free from retaliation. He then confirmed again that he wanted the accommodation process to stop. The City therefore stopped the accommodation process and closed Riley's accommodation file.

It is undisputed that at no point after this did Riley ever provide the additional information from his medical providers that the City requested about the nexus between his medical conditions and his ability to perform the essential functions of his job.

Riley's temporary position at the electrical shop ended in mid-July 2019. Riley did not experience any high blood pressure episodes while at the electrical shop. He returned to his position at the fire garage.

Seaholm then sent another letter to the City stating Riley's accommodation request needed to be reinstated. Riley also called the City and asked to reengage in the accommodation process. Riley directed the City to work directly with his attorney. The City's attorney sent an email to Riley's attorney that explained again that the previously submitted medical forms did not state what essential functions of Riley's mechanic job that he could not perform as a result of his conditions. The City also explained that it needed updated medical information. Finally, the City's attorney noted that the reasonable accommodation process was not the proper forum for addressing personality conflicts with coworkers. Riley's attorney did not respond.

7

About a month later, in mid-August, Riley was again transported to the hospital due to his blood pressure. The emergency provider at the hospital released Riley that day. Seaholm sent a letter to the City stating that Riley's malignant hypertension was related to conflicts at work and advised "he be allowed a permanent transfer, before he suffers a disabling event." Ex. 148.003. That same day, Seaholm sent a separate letter stating Riley could return to work "assuming he is returning to a safe and supportive work environment." Ex. 148.004. Seaholm testified that neither of these letters placed any restrictions on Riley's return to work. A few days later, Riley was put on light- duty data entry away from the garage, possibly due to an unrelated elbow injury.

On August 22, 2019, the City followed up with Riley's attorney having received no response to its prior email. On August 26, Riley's attorney responded to the City's email and directed the City to work directly with Riley on the accommodation process. In the meantime, Riley experienced another blood pressure spike despite the fact that he was not working in the garage at the time.

The City then sent Riley an email explaining again that his medical providers had not provided necessary information about whether he could perform the essential functions of his job as a fire garage mechanic. Moreover, it had been more that three months since the prior medical questionnaires were submitted. The City also provided a letter for Riley's medical providers explaining that it needed "medical documentation explaining the functional limitations of Mr. Riley's ability to perform the essential functions of his position." Ex. 153.002 (emphasis omitted). In another follow-up letter, the City stated clearly that Riley would need to submit a new medical questionnaire with the required information.

Riley attempted to rely on the prior medical questionnaires and declined to submit new ones. The City explained again that "under the reasonable accommodation process, a reassignment may be provided to an employee who, because of a disability **can no longer perform the essential functions of his/her current position**, with or without reasonable accommodation. The information you have recently provided from Dr. Seaholm referenced the working environment (workplace, job site); however, [it] does not provide information regarding your ability to perform the <u>essential functions</u> of your position." Ex. 150.001. The City also provided the specific medical questionnaire form that needed to be completed.

Trying again, the City followed up with Riley about the questionnaire seeking additional information regarding the specific essential functions of his job he could not perform. The questionnaire asked what essential work activities Riley could not do and whether certain devices or equipment could help him do those tasks. Riley did not respond to any of these inquiries. Over the next four weeks, between mid-September and mid-October, the City contacted Riley three times seeking the same information. Riley still did not respond. In addition, Seaholm testified that he would have been willing to provide information to the City.

On November 8, 2019, after nearly four months of trying to obtain the necessary medical information from Riley's attorney, Riley's medical providers, and Riley himself, the City emailed Riley and stated that based on the lack of response, it would have to close Riley's accommodation request.

Riley, who was still represented by counsel, expressed confusion and frustration because he had already turned in medical questionnaires. Despite the City's multiple explanations in writing, and its letter directed to Riley's medical providers stating exactly what the City needed,

as well as the medical questionnaire form, Riley said he did not understand what information was required.

In November 2019, the City continued to repeat its explanation of what additional information it needed from Riley's medical providers, and Riley continued to refuse to provide additional medical questionnaires. The City continued to explain that Riley's original, filled out questionnaires did not provide sufficient information. It is undisputed that although he was represented by counsel, Riley never returned a new questionnaire with additional information.

In later November 2019, after additional problems with Riley's blood pressure, Seaholm sent another letter strongly advising that Riley receive a permanent transfer "before he suffer[ed] a disabling event." Ex. 175.004. But Seaholm did not return the medical questionnaire. In early December, Seaholm sent a similar letter "strongly advis[ing] that [Riley] be allowed a permanent transfer, before he suffers a disabling event." Ex. 175.006. But neither Riley nor Seaholm provided the questionnaire, and Seaholm did not provide the information about Riley's ability to perform the essential functions of his position that the City needed. In December 2019, Riley sued the City in federal court. This lawsuit was eventually dismissed.

In mid-January 2020, Riley was transported to the hospital again due to anxiety symptoms while he was at work. Seaholm sent another letter stating in part: "For [Riley's] own health and safety he needs to be placed into an alternative work environment. If these episodes continue to recur, he is at very high risk of experiencing an acute cardiovascular event such as stroke or myocardial infarction." Ex. 202.014. The City then contacted Riley acknowledging that he seemed to be seeking reassignment due to his medical condition and asked to meet with him again to discuss the reassignment process. Riley called the City and left a voicemail stating he was *not*

requesting a transfer under ADA, but was requesting a voluntary transfer due to his hostile work environment.

On January 24, the City sent Riley a follow-up email seeking clarification as to whether or not Riley was seeking an accommodation due to his medical conditions. Riley responded later that day but did not answer the question. Ex. 202.017. The City asked again that same day:

> To confirm, [a]re you declining to engage in the reasonable accommodation process (under the ADA) that the [City] office would assist you in due to your medical condition?

Ex. 202.016. Riley responded that day, stating,

> I'm not declining anything. I welcome any help I can get. But you have told me several times stress claims due to bullying and harassment are not covered under [the ADA]. So how could you help me under [the ADA] if I don't qualify in your opinion.

*Id.* The City responded that afternoon and said for the third time:

> Please let us know if you are seeking [our] assistance in the ADA accommodation process due to your medical condition(s). If not, we do not need to meet with you and the interactive process will remain closed.

*Id.* At the same time, Riley was also texting with his union representative, and he asserted in these texts that the City was trying to "force" him to cooperate with the reasonable accommodation process to the detriment of his pending litigation. Ex. 113.015.

Also that day, Riley emailed his boss asking about the status of his paid leave and stated that the City's disability office told him he did not qualify for its services. Riley's boss responded, "the [City] has reached out to you to determine if you would like an accommodation due to medical disability and they have not received a response from you yet." Ex. 202.022. The City offered Riley paid leave time for meetings to address his request for accommodation, if he chose to pursue that route. Riley expressed a willingness to meet, but he did not accept this offer to reopen the

11

accommodation process, nor did Riley submit the medical questionnaire necessary to proceed with exploring reasonable accommodations.

On January 27, Riley was again transported to the hospital due to anxiety symptoms. Riley then contacted the City regarding a transfer to a different department. A human resources representative responded,

> I'm happy to schedule a time for a phone call or meeting with you. As we discussed before, the Fire Marine Diesel Mechanic position only exists in the Fire Garage, so there isn't another position in the City in your classification to transfer to. You can, however, apply for another position in the City or request a voluntary demotion and we can discuss those options.

Ex. 30. Riley applied for other jobs but was not selected for any. Specifically, he applied for a welding position but was not hired. Riley inquired as to why he was not qualified for the welding position, and he received the following response:

> We had subject matter experts evaluate the supplemental questions that you answered during the application process-during this process they were unable to see any information on candidates (names, etc). You did pass minimum qualifications, but as this is a classified list, the supplemental question review was the test. Unfortunately your score was not high enough to be placed on the eligible list.

Ex. 21A. In addition, evidence demonstrated that Riley's welding certificate had expired in 2014. None of these communications involved a direct request from Riley for accommodations due to disability, nor did he submit the necessary medical questionnaires.

On January 28, 2020, Seaholm sent a letter stating that for Riley's health and safety, he needed to be "placed into an alternative work environment" due to hypertensive crises and that "[i]f these episodes continue to recur, he is at very high risk of experiencing an acute cardiovascular event such as stroke or myocardial infarction. Ex. 175.008. Neither Riley nor Seaholm submitted the medical questionnaire regarding the essential functions of Riley's position.

In March 2020, Riley submitted to an independent medical evaluation. Unlike the questionnaires completed by Riley's health care providers in late May 2019, the independent medical examination conducted a review of all of the functions and requirements listed in Riley's job analysis, and the independent medical examiner approved Riley to perform the job of fire and marine mechanic without limitation or accommodation. Despite the City's repeated requests for a complete medical questionnaire, Riley has offered no contrary review of the essential functions of his job from any medical provider.

Several weeks passed, and then on April 27 Riley was transported again to the hospital. None of the people with whom Riley usually had conflicts was present at the fire garage that day.

On May 5, a nurse practitioner sent a letter stating Riley was seen at the emergency department for chest pain and hypertension. While the nurse believed Riley could perform his job duties without limitations, he asked for a transfer to a different department for Riley's "emotional and physical well being." Ex. 160. That same day, Seaholm sent a letter to the City stating that Riley could no longer work at the fire garage. In all prior instances, Riley had been cleared to return to work; this was the first time that any medical provider told the City without equivocation that Riley could not return to work and that he could no longer work at the garage at all.

As a result, also on May 5, Riley was placed on unpaid medical leave until he could provide documentation he was cleared physically and mentally to work at the fire garage. Then, on June 23, Seaholm sent a letter stating that Riley had been diagnosed with posttraumatic stress disorder (PTSD) due to work conditions. Riley did not seek to reengage in the reasonable accommodation process at this time, nor did he provide the medical questionnaires that the City had requested.

While on leave from the City, Riley obtained another job at a gun manufacturer where he was able to perform all of the functions of that position without accommodation. Nevertheless, the City continued to try to engage in the accommodation process with Riley, this time explaining to his attorney that it was willing to explore reassignment as an accommodation and noting Riley's refusal to engage in this process previously. Riley did not respond.

After several months of medical leave from the City, the City sent Riley an email on November 10, 2020, stating that working in the fire garage was an essential function of his position of fire mechanic. No other fire mechanic positions were available at the City.

> As we have explained, reassignment options can be explored as part of the reasonable accommodation process under the Americans with Disabilities Act (ADA). Therefore, if you are requesting a reassignment as a reasonable accommodation, this office (Disability and Leave Management (DLM)) remains ready and willing to assist you if you wish to re-engage in the process.

Ex. 164.001. The email also stated that if the City did not receive a response requesting accommodations or medical clearance saying Riley could work at the fire garage by November 30, 2020, the City would begin medical separation. Riley did not respond.

On December 7, the City sent Riley a letter with its intent to medically separate him on December 31. The letter stated that "[t]he separation would be based on [Riley's] inability to perform the essential functions (work in the Fire Garage) for an undetermined duration." Ex. 165.002.

On December 17, while Riley was on medical leave, Seaholm sent a new letter, this time reverting to his prior position that Riley *could* work at the fire garage, but Riley was told to avoid encounters with coworkers he could not get along with:

> [Riley] has a known history of recurrent hypertensive crises, all requiring ER care and all triggered by highly stressful encounters with his prior coworkers at the fire

garage. [Riley] is physically and mentally capable of working at any work site, including the above fire garage, *but was told to avoid encounters that may lead to the hypertensive crises that had plagued him over the last couple of years*. Historically, per my discussions with [Riley], these had consistently been triggered by his prior coworkers. He is no longer experiencing them now.

Ex. 203.022 (emphasis added). Seaholm testified inconsistently about whether he intended this letter to release Riley to work on the fire garage again. Around the same time, Riley emailed the City and argued that he had not been treated fairly. But Riley did not agree to engage in the accommodation process, he did not seek reassignment within the City's employment, and he did not offer to provide the medical questionnaire that the City required as part of the accommodation process.

On December 23, the City sent Riley another letter and yet another copy of the medical questionnaire indicating that it interpreted Seaholm's December 17 letter to mean Riley could return to work in the fire garage. The City emphasized that working at the fire garage was an essential component of Riley's position as a fire mechanic, and he could not work in the fire garage if he were required to avoid all interaction with other employees. The City sought clarification as to whether Seaholm thought Riley could return to work at the garage or not. Riley never responded, nor did he ever return the medical questionnaire confirming he could return to work, and on January 11, 2021, the City medically separated Riley.

## II. PRETRIAL

Riley sued the City in Pierce County Superior Court in August 2021, claiming failure to accommodate, retaliation, intentional infliction of emotional distress, wrongful termination, and hostile work environment. The trial court dismissed Riley's hostile work environment and retaliation claims on summary judgment. The trial court also granted partial summary judgment

on Riley's intentional infliction of emotional distress claim; the only part of this claim that survived was as it related to interactions Riley had with fire department leaders in the hospital. Riley's failure to accommodate claim survived the City's motion for summary judgment, along with the wrongful termination claim.

Prior to trial, Riley moved to voluntarily dismiss the remainder of his intentional infliction of emotional distress claim. The court granted this motion. Riley also filed a motion in limine seeking to exclude evidence of his medical records created prior to 2018 and those records unrelated to the specific diagnosed conditions Riley alleged. The court denied this motion.

## III. TRIAL[2]

A.    Testimony

At trial, Riley's physician and mental health counselor both testified that aside from his personal conflicts with his coworkers, Riley could perform all of the essential functions of his job as a fire mechanic. They also testified that the accommodation Riley needed was to be moved away from coworkers he was having conflict with and to have "cooperative and congenial relationships with his fellow coworkers." 7 VRP at 953. They explained that working with people he had conflict with exacerbated Riley's physical symptoms of stress.

Dr. Peter Blanck, an expert on organizational behavior and accommodations, testified that he believed the City's interactive process in accommodating Riley was deficient. However, he did not list the extensive communications from the City in the list of things he considered when forming his opinion. Blanck also testified that it would not be appropriate to make an employee who is entitled to an accommodation compete for a new position if he meets the minimum

---

[2] Evidence supporting the above facts was elicited at trial.

qualifications for that position. He testified that if an employee is entitled to an accommodation and meets the minimum requirements for an open position, the "employee would get that position per the EEOC guidance and other guidance, because otherwise that would kind of neuter the whole point of the reassignment process." 8 VRP at 1016.

However, Blanck acknowledged that a "foundational step" and a "threshold action[]" for an employer in the disability accommodation process "is to determine how the employee is limited in his ability to perform the essential functions of his job." 8 VRP at 1037. Blanck testified that medical conditions can change over time and he noted "[t]hey often do." 8 VRP at 1042. He also stated that an employer can seek updated information about a person's medical condition, and it could be prudent for an employer to require up-to-date information. The City's witness testified that Riley never got to the reassignment phase. And Blanck acknowledged that if no reassignment was requested, then an employer could follow the normal competitive process when an employee applied for a different job with the same employer. Finally, it was undisputed that the EEOC was "unable to conclude" that any laws were violated. CP at 756.

When Riley testified, he said that he was confused about the entire process. He felt he was passed back and forth among City employees, and he was never offered a reasonable accommodation that did not require him to work at the garage where his interactions with his coworkers were making him ill.

B.    Judgment as a Matter of Law

At the conclusion of the presentation of Riley's evidence, the City moved for judgment as a matter of law. The City conceded that Riley had medical disabilities. The City argued in relevant part that there was no dispute that Riley could perform all of the essential functions of his job, and

17

thus he had no disability requiring accommodation because it was not enough that he simply had a personality conflicts with certain coworkers. There was no dispute that if he were permitted to work on a garage without coworkers, he could perform every function of his job as a fire and marine mechanic. Moreover, providing new coworkers is not a reasonable accommodation as a matter of law. The City also argued Riley failed to show he adequately cooperated with the City in the interactive process.

The trial court agreed with the City's last argument and concluded that Riley did not cooperate in the accommodation process. The trial court ultimately granted the City's motion and dismissed Riley's accommodation claim.

Riley appeals.

ANALYSIS

I. FAILURE TO ACCOMMODATE

Riley argues the trial court erred in dismissing his claim as a matter of law under CR 50 because there were disputes of fact. Specifically, Riley argues the trial court erred in finding that he did not sufficiently cooperate in the accommodation process because there was substantial evidence showing he cooperated. We disagree.

A.      Burden and Standard of Review

We review a trial court's decision on a motion for judgment as a matter of law de novo. *Davis v. Microsoft Corp.*, 149 Wn.2d 521, 530-31, 70 P.3d 126, (2003). "A motion for judgment as a matter of law must be granted 'when, viewing the evidence in the light most favorable to the nonmoving party, the court can say, as a matter of law, there is no substantial evidence or reasonable inference to sustain a verdict for the nonmoving party.'" *Id.* at 531 (quoting *Sing v.*

*John L. Scott, Inc.*, 134 Wn.2d 24, 29, 948 P.2d 816 (1997)). "Substantial evidence" is evidence "'sufficient . . . to persuade a fair-minded, rational person of the truth of a declared premise.'" *Id.* (alteration in original) (quoting *Helman v. Sacred Heart Hosp.*, 62 Wn.2d 136, 147, 381 P.2d 605 (1963)).

B.      Reasonable Accommodation and Duty to Cooperate

The Washington Law Against Discrimination, chapter 49.60 RCW, makes it unlawful to discharge an employee because of any sensory, mental, or physical disability. *Gibson v. Costco Wholesale, Inc.*, 17 Wn. App. 2d 543, 555, 488 P.3d 869 (2021). An employer must accommodate an employee with a disability unless the accommodation would be an undue hardship. *Id.* Ideally, the employer and employee should engage in a flexible interactive process to determine whether the employee is entitled to an accommodation and, if so, what the accommodation will be. *Id.*

An "essential job function" is "a job duty that is "fundamental, basic, necessary, and indispensable to filling a particular position." *Id.* at 559. Employers are not required to eliminate essential job functions, nor are they required to create new positions to accommodate a disability. *Id.* at 560; *Davis*, 149 Wn.2d at 534. Thus, an employee must show that they can perform the essential functions of their job either without an accommodation or with an accommodation that does not undermine the essential functions. *See Davis*, 149 Wn.2d at 536. For example, where long hours and travel were essential functions that an employee could not perform because of his disability, a disabled employee was not entitled to have his job restructured to significantly reduce the hours worked as an accommodation. *Id.* at 535-36.

However, reassignment to another position has been an available accommodation where the employee can no longer perform the essential functions of their current job even with

accommodation, though reassignment is a last resort. *See id.* (turning to reassignment only after other accommodations were ineffective because Davis could not perform the essential functions of his current job under any circumstances). Where reassignment is the appropriate path, the accommodation process envisions an exchange where the employer and employee communicate openly to achieve the best match between the employee's capabilities and available positions. *Id.* at 536-37.

Regardless of the type of accommodation requested, the Washington Law Against Discrimination requires a flexible, interactive process and a sharing of information between employer and employee. *Frisino v. Seattle School Dist. No. 1*, 160 Wn. App. 765, 779-80, 249 P.3d 1044 (2011). The employee must initiate the process through notice to the employer that the employee has an impairment that affects their ability to perform their work. *Id.* The impairment must be shown through the interactive process to exist in fact. RCW 49.60.040(7)(d). The employee has a duty to cooperate with the employer's efforts by providing information about the employee's disability and qualifications, meaning their ability to perform the various functions of their position. *Frisino*, 160 Wn. App. at 780.

To decide whether an accommodation is reasonable, specific job functions and the impact of a disability on those job functions should be evaluated. *Riehl v. Foodmaker, Inc.*, 152 Wn.2d 138, 146, 94 P.3d 930 (2004). An employer may require medical documentation to show a nexus between the medical condition and the need for accommodation. *Id.* at 148. The employee must provide "medical documentation establish[ing] a reasonable likelihood that engaging in the job functions without an accommodation would create a substantially limiting effect." *Gamble v. City of Seattle*, 6 Wn. App. 2d 883, 888, 431 P.3d 1091 (2018); RCW 49.60.040(7)(d)(i)-(ii). The

accommodation process requires that the employee must supply sufficient information so an employer can evaluate whether an accommodation may be needed. *Wurzback v. City of Tacoma*, 104 Wn. App. 894, 899, 17 P.3d 707 (2001).

The employee also has a duty, "flow[ing] from the mutual obligations of the interactive process," to continue to communicate with the employer throughout the process. *Frisino*, 160 Wn. App. at 783. "A good faith exchange of information between the parties is required whether the employer chooses to transfer the employee to a new position or to accommodate the employee in the current position." *Id.* at 780. An employee's failure to adequately communicate essential information to the employer or to provide medical confirmation or documentation can be a basis for dismissing the employee's claim as a matter of law. *Riehl*, 152 Wn.2d at 148-49, 149 n.6 (finding doctor's notes not enough); *Mackey v. Home Depot USA, Inc.*, 12 Wn. App. 2d 557, 586-87, 459 P.3d 371 (2020).

C.      Riley's Failure to Cooperate and Communicate

For purposes of its CR 50 motion, the City did not dispute that Riley had a disability. Instead, the City argued that Riley's failure to accommodate claim was properly dismissed because even considering the facts in the light most favorable to Riley, Riley did not adequately cooperate and communicate with the City. We agree that there is undisputed evidence that Riley failed to provide required medical documentation: he was at best inconsistent as to whether he was requesting an accommodation, at times refusing to explore accommodation based on his disability, and he actively resisted reassignment as an accommodation.

Despite the City's numerous clearly stated requests (including at least six requests in writing), Riley failed to provide updated and complete medical questionnaires, which amounted

to a failure to meet his obligation to provide medical documentation showing the nexus between his medical condition and the need for accommodation. Although Riley submitted questionnaires from his doctor and mental heath counselor in May 2019, they did not identify limitations in Riley's ability to perform his job and they did not provide an assessment of his ability to perform the essential functions of his job in light of his disability. The only full evaluation of Riley's ability to perform essential functions was an independent medical evaluation that concluded that he could perform his job without limitation. Moreover, soon after Riley submitted the May 2019 questionnaires, he withdrew from the accommodation process for several weeks, and he never provided updated questionnaires over the next year and a half, despite multiple clear requests from the City.

Riley asserts that the letters from Seaholm were adequate substitutes, but they were not. Seaholm repeatedly cleared Riley to return to work in the fire garage without restriction. Seaholm's letters also focused on Riley's relationships with his coworkers, not the nexus between his disability and the functions of his job. Only in late 2020 did Seaholm conclude and communicate to the City that Riley could no longer work in the garage at all. When the City received that determination, it began the process of exploring reassignment, but Riley actively resisted reassignment as an accommodation and then stopped communicating with the City at all.

Riley also contends that Blanck's testimony, when viewed in the light most favorable to Riley, should have prevented the trial court from dismissing his accommodation claim. But Blanck testified that medical conditions can change over time, and he acknowledged an employer can seek updated information about a person's medical condition. Nothing about Blanck's testimony

overcomes the undisputed evidence that Riley failed to provide the necessary medical documentation and failed to otherwise cooperate in the interactive process.

Riley also claims that his failures were the result of understandable confusion. But this argument ignores the evidence presented at trial, including multiple clear written communications from the City explaining it needed updated medical questionnaires. This argument also ignores undisputed communications between Riley and his union representative showing that Riley was resisting reassignment as an accommodation because he thought it would harm his litigation position. Finally, Riley was represented and had the assistance of counsel who could explain the process to him and intervene with the City if necessary.

In sum, there is no substantial evidence or reasonable inference to sustain a conclusion that Riley fulfilled his obligation to cooperate with the City and to provide the medical documentation the City was entitled to obtain. A fair-minded, rational person could not conclude that Riley adequately cooperated in the interactive process with the City. Therefore, the trial court did not err when it dismissed his reasonable accommodation claim.

## II. HOSTILE WORK ENVIRONMENT

Riley argues the trial court erred in dismissing his hostile work environment claim at summary judgment because there were questions of material fact. We disagree.

We review orders granting summary judgment de novo. *Dean v. Fishing Co. of Alaska*, 177 Wn.2d 399, 405, 300 P.3d 815 (2013). Summary judgment is appropriate when "'there is no genuine issue as to any material fact' and 'the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting CR 56(c)).

A plaintiff in a disability based hostile work environment case must prove, among other things, that they experienced unwelcome harassment because of their disability. *Robel v. Roundup Corp.*, 148 Wn.2d 35, 45, 59 P.3d 611 (2002). "Casual, isolated, or trivial incidents [of harassment] do not affect the terms or conditions of employment to a sufficiently significant degree to violate the law." *Crownover v. Dept. of Transp.*, 165 Wn. App. 131, 146, 265 P.3d 971 (2011). Further, the harassing conduct "'must be so extreme as to amount to a change in the terms and conditions of employment.'" *Id.* (quoting *Adams v. Able Bldg. Supply, Inc.*, 114 Wn. App. 291, 297, 57 P.3d 280 (2002)).

Riley failed to satisfy the requirement that the alleged harassment by his coworkers affected the terms and conditions of his employment. The conduct Riley complained of was not so extreme as to satisfy this element. *Id.* Despite the serious reactions Riley had to his coworkers' claimed behavior, the incidents were trivial. Only two of the alleged incidents even come close to being nontrivial—Riley alleged one coworker raised her hand as if to slap Riley and another threatened to "kick [Riley's] ass." 6 VRP at 713. The first was an isolated incident. And Riley presented no evidence that the threat was because of his disability. Therefore, Riley failed to establish a *prima facie* case that he was subject to a hostile work environment, and the trial court did not err in dismissing this claim at summary judgment.[3]

---

[3] In his brief, Riley includes an assignment of error and an issue regarding the dismissal of his claim of intentional infliction of emotional distress. But he does not include any further argument or explanation of this issue in the text of his brief. As a result, we need not address this argument further.

Riley also argues that the trial court erred when it denied his motion in limine to exclude evidence of health problems he had before he worked for the City. But because such evidence is not relevant to the determinative issues in this appeal—whether Riley adequately cooperated in

## ATTORNEY FEES

Riley requests attorney fees on appeal under RAP 18.1(a)-(b) and RCW 49.60.030(2).

Because Riley does not prevail, we decline to award him attorney fees on appeal.

## CONCLUSION

We affirm.

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040,

it is so ordered.

GLASGOW, J.

I concur:

CRUSER, C.J.

---

the accommodation process and whether he experienced a hostile work environment—and we decline to remand for retrial, we need not address this issue further.

VELJACIC, J. (DISSENT) — Liam Riley appeals the trial court's dismissal of his claims against the City of Tacoma. He argues the court erred in granting the City's motion for judgment as a matter of law on his failure to accommodate claim.[4] He argues the court erred in earlier granting summary judgment dismissing his intentional infliction of emotional distress and hostile work environment claims. He also argues the court erred in denying his motion in limine to exclude certain medical records at trial.

Since substantial evidence or a reasonable inference exists to persuade a rational fair-minded person that the City of Tacoma failed to accommodate Riley, and that Riley was confused about the accommodation process, I would reverse the trial court's grant of the City's motion for judgment as a matter of law. However, I agree with the majority to affirm the trial court's summary dismissal of Riley's intentional infliction of emotional distress and hostile work environment claims as well as its denial of Riley's motion to exclude medical evidence at trial.

FACTS

I. FACTUAL BACKGROUND

A. Riley's Position and Early Medical Conditions

Riley began working for the City of Tacoma as a fire and marine diesel mechanic in 2013. He predominantly worked on-site in the only fire garage in the fire department. However, occasionally work was required in the field, at the boathouse, or wherever the fire boat was located.

---

[4] Specifically, Riley assigns error to the court's grant of the City's CR 50 motion dismissing all of Riley's remaining claims (which would have included the wrongful termination claim). However, Riley provides no argument in his brief regarding the wrongful termination claim. As such, we do not address it. *See State v. Elliott*, 114 Wn.2d 6, 15, 785 P.2d 440 (1990) ("This court will not consider claims insufficiently argued by the parties.").

Riley's duties consisted of repairing fire department vehicles and equipment, including tasks such as welding and fabricating.

Riley testified that between 2014 and 2016, he suffered from numerous health problems including fatigue, pain, and feeling like his legs were on fire. He sought treatment from multiple physicians including Dr. Norman Seaholm, who had been his physician for at least 12 years. Dr. Seaholm testified that Riley had high blood pressure for many years before he started working for the City.

B.     Riley's Initial Request to the City, Conflicts, and Blood Pressure Spikes

Riley testified that he communicated these health problems to Donald Voigt, his direct supervisor, and Voigt changed Riley's duties so he could continue working. Riley said that in response, his coworkers called him "Don's pet and his golden boy" and said "that [Riley] would get away with everything." 4 Rep. of Proc. (RP) at 245. He testified that this caused him stress and anxiety and he felt that he needed to get help beyond Voigt.

In January 2018, Riley texted Chief Patrick McElligot and reported that he was "being illegally discriminated against." Ex. 108, at 001.[5] The text message complained of one of his coworkers, Carol Haeger, not getting parts and supplies for him to be able to do his job. Riley testified that this text message did not contain all the instances of him being discriminated against, but, rather, the message was just him reporting that it was happening. Riley testified that after he sent this text, he had a meeting with McElligot and Voigt. He testified that after that meeting things got better for about six months.

---

[5] Riley testified that prior to 2018 he complained to Voigt, his direct supervisor, firefighters, coworkers, and battalion chiefs, but not in written form.

Riley testified that on June 13, 2018, he got into a conflict with Haeger over auto parts, during which Haeger screamed at him. Riley said that Haeger had purposefully violated garage protocol and placed boxes behind the vehicle he was working on, and he ran them over. Fire Department personnel checked his blood pressure and reported to him that it was 228 over 140.[6] Due to this blood pressure spike, Riley was transported to the hospital from work via ambulance. Riley said that while he was on the gurney, Haeger looked at him with "hate and disdain." RP (May 3, 2023) at 254.

C.      Riley's Additional Communications with the City

Riley informed Voigt that he was at the hospital and why he had to be taken there. Riley also testified he told John Pappuleas, Voight's supervisor at the time,[7] "what was happening," including things like harassment and bullying and "how it was affecting [him]." 4 RP at 267. Riley testified that he met with Pappuleas on June 15 and felt that the harassment would stop based on Pappuleas's response to his first transport but that was not the case.

On June 27, Dr. Seaholm sent a letter which stated:

[Riley] was seen in the emergency department on 6/13/2018 for a critically elevated blood pressure, requiring urgent management in order to prevent a potentially catastrophic medical event. Work stress certainly played a role in his emergency visit and it was recommended that he remain off work until his blood pressure was more appropriately controlled. He has since been started on medications and his blood pressure is now under better control. He was given the release to return to work as of 6/26/2018.

Ex. 175, at 001.

---

[6] Hospital records document that his blood pressure at this time was 221 over 138.

[7] McElligot retired and was replaced by Pappuleas.

Riley documented and complained of other instances of conflict in the workplace, including Haeger calling him names, swearing at him, arguing over who should close the gate at night, Haeger giving him dirty looks, and shushing him. Riley testified that Haeger once raised her hand at him as if she was going to slap him, however, he believed his documentation of this incident was stolen. Riley also testified that another coworker, Paul Howard, harassed him. Riley said that Howard told Voigt that Riley was not doing his job well. Riley also said that he and Howard got into conflicts over what radio station to listen to in the garage. Riley said that Howard told him on multiple occasions he was going to "kick his ass," but that his documentation of this incident was also part of the stolen documents. 6 RP at 712-13.

D.      The City Takes the Position that there Exists a Personality Conflict, But Not Discrimination; Riley's Blood Pressure Spikes Continue

In February 2019, Shelby Fritz, from human resources, conducted a "[c]limate [a]ssessment" where she met privately with all employees and "review[ed] practices and processes in place at the Fire Garage." Clerk's Papers (CP) at 659. Fritz concluded there was no support for Riley's claims that he was discriminated against or bullied at work, but that he did have personality conflicts with Haeger and Howard. However, she stated several of his coworkers considered him to be the "catalyst for the interpersonal conflicts." CP at 660. Fritz maintained that this climate assessment was "not an investigation." Ex. 24.

On February 6, Dr. Seaholm sent a second letter stating that Riley was at high risk for a cardiovascular event and resolution to work conflict was key to his recovery.

Riley had a second transport to the hospital on March 19. His blood pressure was 236 over 134. During this hospital visit, Riley testified Pappuleas "burst into [his] room and started yelling at [him]." 6 RP at 620.

On March 25, Dr. Seaholm sent a third letter stating that Riley had two emergent transports relating to work conflict and that he was at high risk of stroke if his blood pressure spikes occurred one too many times.

E.    Riley's Request for Accommodations and Interactions with the City's Disability and Leave Management Office and Human Resources (HR) Office

In April 2019, the City reached out regarding accommodations.  On April 22, the Disability and Leave Management office (DLM) sent Riley a questionnaire for his medical providers to complete.  This questionnaire had written at the top that Riley requested to be "'somewhere else in the city that is [a] safe and healthy work environment.'"  Ex. 136, at 002 (emphasis omitted).

On May 29, Riley returned two copies of this questionnaire.  Dr. Seaholm completed the questionnaire and checked the box that stated Riley's restrictions were on a permanent basis.  Dr. Seaholm also stated that

> [h]ypertension is usually a risk factor for cardiovascular events over several decades.  [Riley] however has required emergent transport to [the emergency room] from work due to headaches and blood pressure of 236/164 on 3/19/19.  That is an immediate risk for catastrophic cardiovascular event.  Current work conflicts appear to be playing a significant role.

Ex. 140, at 004.

Karey Regala, Riley's mental health therapist, also filled out the medical questionnaire.  She checked the box on the questionnaire that stated Riley's restrictions were on a temporary basis and regarding the anticipated duration stated:

> Per client report, anxiety and stress, including panic attack episodes would cease if client could perform work duties in a safe and healthy environment.

Ex. 140, at 005.

Regala recommended in the questionnaire that,

Per client report, Mr. Riley can perform all job duties necessary provided he be placed in a role where his work environment be deemed safe and healthy, where on a daily basis he doesn't feel threatened or bullied by fellow co-workers.

Ex. 140, at 007.[8]

On June 3, Pappuleas sent Riley a letter that stated:

You recently requested to be moved to a different working location. I was made aware of a temporary need for assistance at the Electrical Shop related to changes in staff availability. Given your request, I thought you might be interested in this temporary work assignment during the staffing shortage.
. . . .
This opportunity is temporary and **is not** being offered as permanent assignment nor is it related to any accommodation process.

CP at 718. Riley accepted the temporary assignment and contacted DLM to "freeze" the accommodations process until further notice because he was in a safe and healthy work environment. Ex. 142, 001.

The temporary position at the electrical shop ended on July 15, 2019. Riley did not experience any high blood pressure episodes while at the electrical shop.

On July 16, Dr. Seaholm sent another letter, his fourth, stating Riley's Americans with Disabilities Act (ADA) accommodation request needed to be re-instated because he had to return to the fire garage.

---

[8] After this, on June 3, 2019, Riley filed a complaint with the Equal Employment Opportunity Commission (EEOC). However, the EEOC was "unable to conclude" that any laws were violated. CP at 756.

31

      F.      Riley Re-Engages the Accommodations Process; the City Takes the Position that Riley Could Perform All the Essential Functions of His Job Without Accommodation

On July 19, Riley called DLM and requested to re-engage in the accommodations process. Riley directed DLM to work directly with his attorney because he "didn't understand the process." 9 RP at 1348. On July 24, the City's attorney sent an e-mail to Riley's attorney that stated in part:

> Before Mr. Riley *withdrew* his reasonable accommodation request, information provided to the DLM team indicated that *Mr. Riley could perform all of the essential functions of his position without an accommodation; his issue involved conflicts with his coworkers.* Karey Regala, Mental Health Therapist, noted on May 20,2019 that "Per client report, Mr. Riley can perform all job duties necessary provided he be placed in a role where his work environment be deemed safe and healthy where on a daily basis he doesn't feel threatened or bullied by fellow co-workers." Updated medical information will be sought as part of the re-engagement in the interactive process and the DLM team will respond appropriately. However, the reasonable accommodation process is not the proper forum for addressing *personality conflicts*.

Ex. 147, at 001 (emphasis added).

On August 12, Riley was again transported to the hospital due to his blood pressure.

On August 15, in addition to his responses to the first questionnaire, Dr. Seaholm sent a fifth letter stating that Riley required another emergent transport due to malignant hypertension relating to conflicts at work and strongly advised "he be allowed a permanent transfer, before he suffers a disabling event." Ex. 202, at 012. Dr. Seaholm noted that "when [Riley] [was] transferred to another department his hypertensive emergencies ceased." Ex. 202, at 012. That same day, Dr. Seaholm sent another letter stating Riley could return to work "assuming he is returning to a safe and supportive work environment." Ex. 175, at 003.[9]

---

[9] It is unclear if this letter accompanied the other letter sent that day. Because of this lack of clarity, we do not include this letter in our Dr. Seaholm letter count.

On August 20, Riley began working at the training center on light duty because of an elbow injury. On August 23, Riley stated he had an "altercation with Bruce Bouyer," experienced a hypertensive crisis, and transported himself to the hospital. 9 RP at 1356-57.

On August 26, Riley's attorney responded to the City's e-mail and directed DLM to work directly with Riley.

On September 13, DLM sent Riley an e-mail stating that his medical providers had not determined he could not perform the essential functions of his job. DLM also stated,

> Since you withdrew from the interactive process, our office recently received updated medical information. The information from Dr. Seaholm referenced the working environment (workplace, job site), however, he did not provide information regarding your ability to perform the essential functions of your position.
> In an effort to get clarification about your ability to perform the essential functions, we would need to have a medical questionnaire completed. If you would like to continue in the process, let me know and I can send you a medical questionnaire.

Ex. 150, at 002.

Riley responded four days later stating:

> my doctor filled out a medical question[naire] and you accepted it the first time, it is the same and stands.

Ex. 150, at 001.

On September 19, DLM responded to Riley and stated the following:

> Yes, we do still have the medical questionnaire your providers filled out several months ago. However those medical questionnaires were submitted as part of your original reasonable accommodation (r/a) request. Once you notified our office that you wanted to withdraw from the process, that closed down your request. As explained, our office takes no further reasonable accommodation efforts when an employee withdraws. When you asked to engage in the process our efforts start over. As part those efforts, we need clarification.
> . . . In regards to you being moved. As explained, under the reasonable accommodation process, a reassignment may be provided to an employee who,

33

because of a disability can **no longer perform the essential functions of his/her current position**, with or without reasonable accommodation. The information you have recently provided from Dr. Seaholm referenced the working environment (workplace, job site); however, does not provide information regarding your ability to perform the <u>essential functions</u> of your position.

Ex. 150, at 001.

DLM sent Riley a second questionnaire seeking additional information regarding the specific essential functions of his job he could not perform. The questionnaire inquired into whether Riley could do things like sit, stand, reach overhead, or drive for a certain number of hours. It also inquired into what key work activities Riley could not do, and whether certain devices or equipment could help him do those tasks.

On November 8, DLM e-mailed Riley and stated in part:

The purpose of this email . . . is to notify you that due to a lack of response to our requests for medical documentation supporting your request for a reassignment under the ADA, the DLM office cannot move forward with a reasonable accommodation and will therefore close your request with no further action.

Ex. 155, at 006.

Riley responded to DLM that same day apparently expressing confusion and frustration because he had already turned in medical questionnaires and did not understand what additional information was needed.

Then, on November 21, DLM responded stating that it had the original questionnaires Riley turned in, but that it needed additional clarification. Riley responded again appearing to express confusion, frustration, and even mistrust of the process.

DLM responded:

I'm sorry that you are unhappy with the response, but we have worked hard to help you within the guidelines of the ADA and are simply unable to assist you further in the reasonable accommodation process without this information (medical questionnaire dated September 19, 2019).

Ex. 155, at 004.

Riley responded, "those are the ones I turned in my medical providers said they stand and to turn them back in[,] so you have had them the whole time." Ex. 155, at 003.

In subsequent e-mails, DLM attempted to clarify that the September 19 medical questionnaire was different than the two original medical questionnaires Regala and Dr. Seaholm provided. Riley never returned this second questionnaire from September 19.

G.    Dr. Seaholm Sends Additional Letters; Riley Undergoes Another Blood Pressure Spike and Emergency Transport; the Parties Continue Their Dispute in Writing.

On November 22, Dr. Seaholm sent a sixth letter stating Riley required several emergent transports due to malignant hypertension related to work conflicts and that he strongly advised Riley receive a permanent transfer "before he suffer[ed] a disabling event." Ex. 175, at 004.

On December 3, Dr. Seaholm sent a seventh letter stating his same concerns about Riley and "strongly advis[ing] that [Riley] be allowed a permanent transfer, before he suffers a disabling event." Ex. 175, at 006.

On January 14, 2020, Riley was transported to the hospital for a fifth time due to a blood pressure spike.

On January 16, Dr. Seaholm sent an eighth letter stating in part:

For [Riley's] own health and safety he needs to be placed into an alternative work environment. If these episodes continue to recur, he is at very high risk of experiencing an acute cardiovascular event such as stroke or myocardial infarction.

Ex. 202, at 014.

On January 22, DLM sent Riley an e-mail stating that Riley's department made it aware

he may be requesting reassignment due to his medical condition and that it wanted to meet with

him the next day to discuss the process.

Riley called DLM and left a voicemail stating he was not requesting a transfer under ADA,

but was requesting one due to his hostile work environment.

Riley responded to DLM's e-mail on January 23 and stated:

> I am happy to cooperate in any way possible. I must stress though, I am being told by my doctor and therapist that I need to be placed in and [sic] alternative work environment due to the episodes that only happen in my current work environment due to bullying, harassment and the hostile work environment that I've be[e]n subject to for over 2 years of officially reporting and longer than that with just reporting to my supervisor verbally.
>
> I am still requesting a voluntary transfer to another department as I have be[e]n requesting for over a year now. I have requested this transfer due to the fact that the fire department and HR refuse to rectify the situation and against my doctors recommendations knowingly put me in harm[']s way by returning me to a hostile work environment causing me 3 more life threatening ambulance rides to the [emergency room]ER from work.
>
> As you have stated several times my case is not covered under the [ADA] guidelines in your opinion so I am glad that you are willing to meet and talk about my voluntary transfer. I would like to bring representation if that is ok. Also do you have a list of available jobs for me to look over when we meet.

Ex. 202, at 018.

On January 24, DLM sent Riley a follow-up e-mail seeking clarification as to whether or

not Riley was seeking an accommodation due to his medical conditions. Riley responded later

that day and said:

> I know you don't assist in voluntary transfers. I'm not sure why they had you contact me . . . [sic] this recent event stemmed from me needing to be ambulance transported from work a 4th time and my doctors note that resulted because of it. He stated that I needed to be removed yet again and placed in a safe and healthy work environment[,] they put me on paid administrative leave, and I'm

waiting to hear what the plan is. [P]lease put me in contact with someone who can help me with moving me to a healthy and safe work environment.

Ex. 202, at 017. The DLM office responded that same day and said:

To confirm, [a]re you declining to engage in the reasonable accommodation process (under the ADA) that the DLM office would assist you in due to your medical condition?

Ex. 202, at 016. Riley responded that day stating:

I'm not declining anything. I welcome any help I can get. But you have told me several times stress claims due to bullying and harassment are not covered under [ADA]. So how could you help me under [ADA] if I don't qualify in your opinion.

Ex. 202, at 016. DLM responded that afternoon and said:

Please let us know if you are seeking the DLM Office's assistance in the ADA accommodation process due to your medical condition(s). If not, we do not need to meet with you and the interactive process will remain closed.

Ex. 202, at 016.

On January 24, Riley e-mailed Pappuleas asking about the status of his paid leave and stating that the ADA office told him he did not qualify for services.

On January 25, Pappuleas e-mailed Riley and stated:

If I understand correctly, the DLM office has reached out to you to determine if you would like an accommodation due to medical disability and they have not received a response from you yet. From what I understand, ADA does not address interpersonal conflicts but does cover medical disabilities, so I believe that may be something you could ask them about. If you are interested in re-engaging with Liz at the DLM office on Monday, you will be granted an extension of Administrative Paid Leave for that day and will not need to report to the Fire Garage. If you are not interested in re-engaging with the DLM office regarding what resources may be available to you, you are to report to your regular assignment at the Fire Garage.

Ex. 202, at 022.

Riley responded:

> I do not have a medical disability covered by their department.  They have told me they can[]not assist me with this.  I asked them to put me in contact with who could help me with my transfer[,] per my doctors note he recommends you put me in a safe and healthy work environment free from bullying and retaliation . . . he also states if this is not done I'm at high risk of stroke or heart attack. . .
>
> [S]o let me know if I'm hearing you rite[sic]. . . if I don't re engage with the DLM department that can[']t help me because they don't cover my condition, I'm to return to the fire garage against my doctor['']s wishes where you are knowingly putting me in to harm[']s way again, rather than finding a temporary or permanent transfer location for me to be moved to so I don't have another cardiovascular event?

Ex. 202, at 021.

Pappuleas responded:

> I am not aware of all the resources available to you at the DLM office but I know they have reached out to you late Friday with more information.  I am not sure if you have seen the email and [were] able to respond.
>
> As you are aware, the fire garage has had multiple reviews and a climate assessment performed to evaluate the fire garage environment.  Each time the garage has been shown to be a safe place to work.  The fire department would not support anything less.
>
> If you do not wish to reach out to the DLM office on Monday and do not feel comfortable reporting to your assignment at the fire garage I believe you may have leave available that you may use if you wish.  If you wish to take leave, make sure to let your supervisor know.

Ex. 202, at 021.

On January 27, Riley was transported to the hospital a sixth time due to a blood pressure spike.

Riley contacted Fritz regarding his request to transfer to a different department.  Fritz responded:

> I'm happy to schedule a time for a phone call or meeting with you.  As we discussed before, the Fire Marine Diesel Mechanic position only exists in the Fire Garage, so there isn't another position in the City in your classification to transfer

to. You can, however, apply for another position in the City or request a voluntary demotion and we can discuss those options.

Ex. 30, at 1. Riley applied for jobs, but was not selected for any. Specifically, he applied for a welding position but was not hired. Riley inquired as to why he was not qualified for the welding position, and he received the following response:

> We had subject matter experts evaluate the supplemental questions that you answered during the application process-during this process they were unable to see any information on candidates (names, etc). You did pass minimum qualifications, but as this is a classified list, the supplemental question review was the test. Unfortunately your score was not high enough to be placed on the eligible list.

Ex. 21A, at 3.

On January 28, Dr. Seaholm sent a ninth letter stating that for Riley's health and safety he needed to be "placed into an alternative work environment" due to hypertensive crises, and that "[i]f these episodes continue to recur, he is at very high risk of experiencing an acute cardiovascular event such as stroke or myocardial infarction. Ex. 175, at 008.

On April 27, Riley was transported for the seventh time to the hospital because of a blood pressure spike. Haeger and Howard were not present at the fire garage that day.[10]

On May 5, Advanced Registered Nurse Practitioner, Anthony Stephens, sent a letter stating Riley was seen at the emergency department for chest pain and hypertension and that while he believed Riley could perform his duties without limitations, he asked for a transfer to a different department for Riley's "emotional and physical well being." Ex. 160, at 001. That same day, Dr.

---

[10] Before this event, on March 24, 2020, Dr. Robert Thompson conducted an independent medical examination of Riley. In an addendum to his initial report, on August 12, 2020, Dr. Thompson concluded that Riley did not suffer a "hypertensive crisis" during his episodes at work, but rather, his "acute reactions" to these events "pose[d] no danger to Mr. Riley's health." Ex. 171, at 002-003.

Seaholm sent a tenth letter stating Riley could return to work the next day but needed to be placed in an alternative work location.

On May 5, Riley was placed on unpaid medical leave until he could provide documentation he was cleared physically and mentally to work at the fire garage.[11] Pappuleas stated that this leave was an accommodation. Then, on June 23, Dr. Seaholm sent a letter (his eleventh) stating that Riley had been diagnosed with post-traumatic stress disorder (PTSD) due to work conditions.

DLM sent Riley an e-mail on November 10, 2020, stating in part:

> It is our understanding that the Human Resources Department (Assistant Director Shelby Fritz) and your Department previously informed you that working in the Fire Garage is an essential function of your position. Additionally, they confirmed there are no options for you to perform that work anywhere else because there are no other Fire and Diesel Mechanic positions within the City; therefore, you cannot be "transferred" to another department as a Fire and Diesel Mechanic.
>
> As we have explained, reassignment options can be explored as part of the reasonable accommodation process under the Americans with Disabilities Act (ADA). Therefore, if you are requesting a reassignment as a reasonable accommodation, this office (Disability and Leave Management (DLM)) remains ready and willing to assist you if you wish to re-engage in the process.

Ex. 164, at 001. The e-mail also stated that if DLM did not receive a response requesting accommodations or medical clearance saying Riley could work at the fire garage by November 30, 2020, the City would begin medical separation.

On December 7, the City sent Riley a letter with its intent to medically separate him on December 31. The letter stated "[t]he separation would be based on [Riley's] inability to perform the essential functions (work in the Fire Garage) for an undetermined duration. Ex. 165, at 002.

---

[11] *But see* Ex. 203, at 010 (noting Riley was on medical leave from April 27, 2020 to January 2021).

On December 17, while Riley was on medical leave, Dr. Seaholm sent a twelfth letter stating:

> [Riley] has a known history of recurrent hypertensive crises, all requiring ER care and all triggered by highly stressful encounters with his prior coworkers at the fire garage. [Riley] is physically and mentally capable of working at any work site, including the above fire garage, but was told to avoid encounters that may lead to the hypertensive crises that had plagued him over the last couple of years. Historically, per my discussions with [Riley], these had consistently been triggered by his prior coworkers. He is no longer experiencing them now.

Ex. 203, at 022. Riley e-mailed DLM and the City and stated in part:

> I have still not be[e]n able to gain access to my city email to find the quote. But at one time I was offered reasonable accommodations if and only if I said my high blood pressure events were due to my own medical condition. At that point I replied to that department and . . . stated that I wanted a transfer so bad but refused to lie to get it. I am a person of the highest integrity and even though I wanted it more than anything I would not sacrifice my integrity to get it. Then again recently when the DLM department offered reasonable accommodations, I asked on what grounds would I be granted accommodations because I was told previously that I did not qualify under my condition. They never gave me an answer.
>
> As far as me applying for other jobs to transfer out of the hostile work environment that the city refused to fix. I applied for several jobs being told each time I did not qualify. Especially notably the 3 times I applied for the welder fabricator job. Where I have 25+ years['] experience and it is part of my job dut[ie]s at the fire garage. I was told I do not qualify for that job all 3 times even when speaking to a HR rep[resentative] in person over the phone explaining my experience.
>
> I again [] ask all of you, please help me! That is all I have done from the beginning is ask for help. It has gone un[]answered even when my situations were verified and validated in meetings with Don Voight, Chief Pap[p]ul[ea]s, Chief [B]ouyer, Shelby [F]ritz, [J]ude Kelly, my union rep[resentative] [T]ommy [H]unt and myself. Even when the hostile environment and bullying was verified and validated that it happened, nothing was done to correct the situation. And I ended up in the [emergency room] several more times with ambulance rides from work.

Ex. 166, at 001.

On December 23, DLM sent Riley another letter and third medical questionnaire indicating that it interpreted Dr. Seaholm's December 17 letter to mean Riley could return to work in the fire

garage.  Riley never responded or returned the medical questionnaire confirming he could return to work there, and on January 11, 2021, the City medically separated Riley.

II.     PRETRIAL

Riley brought suit against the City in August 2021, claiming failure to accommodate, retaliation, intentional infliction of emotional distress, wrongful termination, and hostile work environment.  Riley's hostile work environment and retaliation claims were dismissed on summary judgment.  Partial summary judgment was granted on Riley's intentional infliction of emotional distress claim.  The only part of this claim that survived was as it related to interactions Riley had with fire department leaders in the hospital.  Riley's failure to accommodate claim survived the City's motion for summary judgment, along with the wrongful termination claim as it related to the other remaining claims.

Prior to trial, Riley moved to dismiss the remainder of his intentional infliction of emotional distress claim.  The court granted this motion.

> [RILEY'S COUNSEL]: . . . [S]o with respect, in the interest of judicial economy, Mr. Riley moves to dismiss the outrage[12] claim.
> [THE COURT]: Okay.  Obviously, we're right under CR 41 to dismiss it anytime before we get to the end, so, obviously, that's fine.  That will be granted.

1 RP at 4.

Riley also filed a motion in limine seeking to exclude evidence of medical records prior to 2018 and unrelated to the specific diagnosed conditions Riley alleged.

The court denied this motion concluding that this was a "unique claim . . . because of the emotional or psychological component to it" and the fact that an "emotional injury [was] causing

---

[12] "'Outrage' and 'intentional infliction of emotional distress' are synonyms for the same tort." *Kloepfel v. Bokor*, 149 Wn.2d 192, 193 n.1, 66 P.3d 630 (2003).

a physical problem." 1 RP at 42, 47. The court reasoned, for example, that records pertaining to stressful events that occurred at his previous place of employment and its connection to his PTSD were directly related to his current claim and would determine what accommodations might have been appropriate.

> THE COURT: . . . I do think Mr. Riley's claim is relatively unique. Not that[] it's singular or that there's no one else in the world that's got a similar situation, but most of the time when we're dealing with something like this, a failure to accommodate a disability, we're talking about a physical or sensory limitation of some sort. And that's not what we're talking about here. . . . That's why I think these are unusual circumstances.

1 RP at 51-52.

II.     TRIAL[13]

At trial, Dr. Peter Blanck, an expert on organizational behavior and accommodations, testified that the City's interactive process in accommodating Riley was deficient. The following exchange also took place:

> [RILEY'S COUNSEL]: . . . Is it appropriate for an employer to require a disabled person known to be disabled by the employer to compete for positions within their organization?
> [DR. BLANCK]: If you mean for purposes of reassignment, then it would not be appropriate to have the employee compete for that position if he is otherwise qualified for that position. Again, the employee does not have to be the best qualified.
> [RILEY'S COUNSEL]: If an employee meets minimum qualifications for a position that is open and the Defendant knew that, what should they have done?
> [DR. BLANCK]: Well, then the employee would get that position per the EEOC guidance and other guidance, because otherwise that would kind of neuter the whole point of the reassignment process.

8 RP at 1016. Elizabeth Marlenee from DLM testified that Riley never got to the reassignment phase because he never returned the medical questionnaire seeking additional information.

---

[13] Evidence supporting the above facts was elicited at trial.

Riley testified that he was confused about the entire process, stating:

I was very confused about the whole situation because the DLM department would refer me to HR. And then HR would say, but it's a medical condition because you're getting medically transported in your notes, so go back to DLM. And DLM was like, we can't help you; go back to HR. And it was back and forth the whole time. And it seemed like no one was really listening to each other or the issues at hand.

Meanwhile, I just kept getting transported and kept asking for help. I probably sent hundreds of e-mails with daily reports of what was going on, what was happening to me, how I felt, my fears. Just saying, I'll go anywhere; I'll do anything.

I knew that they weren't going to rectify the situation in the fire garage because they refused to even do an investigation or follow personnel management policies, which they say zero tolerance on the policies, but they didn't even initiate the policies.

And I just said, I'll go anywhere, I'll do anything. I don't care what I have to do just as long as I don't have to go back there because I feel like I'm going to die there.

RP (May 16, 2023) at 331-32.

A. Judgment as a Matter of Law

At the conclusion of Riley's case, the City moved for judgment as a matter of law. The City conceded that Riley had medical disabilities, however, it argued he did not qualify for an accommodation because he could perform the essential functions of his job.

The City argued that Riley's requested accommodation, new coworkers, was unreasonable as a matter of law. The City also argued that Riley failed to show he was qualified for an open position within the City and, therefore, was not entitled to reassignment. Finally, the City argued Riley failed to show he cooperated in the accommodations process.

The court agreed with the City's last argument and concluded that Riley did not cooperate in the accommodations process, rejecting his argument that he was confused by being bounced by the City between DLM and HR.

The court ultimately granted the City's motion and dismissed Riley's claim.

Riley appeals.

ANALYSIS

I.      FAILURE TO ACCOMMODATE

Riley argues the trial court erred in dismissing his claims under CR 50 because there were disputes of fact. Specifically, Riley argues the trial court erred in finding that he did not cooperate in the accommodations process because there was substantial evidence showing he cooperated. The City argues that Riley did not cooperate in the interactive process and therefore, the City had no duty to accommodate him.

The City also argues three alternative bases for why the trial court did not err in dismissing this claim. The City argues that Riley was not entitled to an accommodation because he could perform all the essential functions of his job, that the accommodation he sought was new coworkers which was unreasonable as a matter of law, and that he failed to show there was a "preexisting and vacant position within the City for which he was qualified." Br. of Resp. at 54. I find these alternative bases unpersuasive, and agree with Riley because substantial evidence or a reasonable inference existed to persuade a fair-minded, rational person he was entitled to an accommodation, cooperated in the accommodations process (even though confused by the City's conduct), sought an accommodation that was not unreasonable as a matter of law, was qualified for an existing vacant position, and the City failed to accommodate him.

A.      Legal Principles

We review a trial court's decision on a motion for judgment as a matter of law de novo. *Davis v. Microsoft Corp.*, 149 Wn.2d 521, 530, 70 P.3d 126 (2003). "A motion for judgment as a matter of law must be granted 'when, viewing the evidence most favorable to the nonmoving party, the court can say, as a matter of law, there is no substantial evidence or reasonable inference to sustain a verdict for the nonmoving party.'" *Id.* at 531 (quoting *Sing v. John L. Scott, Inc.*, 134 Wn.2d 24, 29, 948 P.2d 816 (1997)). Substantial evidence is evidence "'sufficient . . . to persuade a fair-minded, rational person of the truth of a declared premise.'" *Id.* (quoting *Helman v. Sacred Heart Hosp.*, 62 Wn.2d 136, 147, 381 P.2d 605 (1963)). "Credibility determinations are within the sole province of the jury. . . Assessing discrepancies in the trial testimony and weighing the evidence are also tasks within the sole province of the jury." *State v. Wilson*, 141 Wn. App. 597, 608, 171 P.3d 501, 507 (2007).

"WLAD [Washington Law Against Discrimination] requires an employer to reasonably accommodate an employee with a disability unless the accommodation would pose an undue hardship." *Frisino v. Seattle Sch. Dist. No. 1*, 160 Wn. App. 765, 777, 249 P.3d 1044 (2011). In order to accommodate an employee, "the employer must affirmatively take steps to help the employee with a disability to continue working at the existing position or attempt to find a position compatible with the limitations." *Id.* at 778. Thus, "[r]easonable accommodation . . . envisions an exchange between employer and employee where each seeks and shares information to achieve the best match between the employee's capabilities and available positions." *Goodman v. Boeing Co.*, 127 Wn.2d 401, 408-09, 899 P.2d 1265 (1995). Further, "[w]hen interpreting WLAD, we are particularly mindful that 'a plaintiff bringing a discrimination case in Washington assumes the role

of a private attorney general, vindicating a policy of the highest priority.'" *Jin Zhu v. N. Cent. Educ. Serv. Dist.-ESD 171*, 189 Wn.2d 607, 614, 404 P.3d 504 (2017) (quoting *Marquis v. City of Spokane*, 130 Wn.2d 97, 109, 922 P.2d 43 (1996)). Therefore, "the legislature and Washington courts require that . . . WLAD's provisions must be given 'liberal construction.'" *Id.* (quoting *Marquis*, 189 Wn.2d at 108).

Accommodation claims present two main questions. *Wilson v. Wenatchee Sch. Dist.*, 110 Wn. App. 265, 269, 40 P.3d 686 (2002). First, does the employee have a disability under the WLAD? *Id.* Second, does the employer have a duty to reasonably accommodate the disability, and if so, has it satisfied this duty? *Id.* at 269-70.

B. Analysis

1. Riley Had a Disability Under WLAD

"In 2007, the legislature amended the WLAD to adopt a definition of "disability," and specify when an employee is eligible for accommodation for a disability." *Johnson v. Chevron U.S.A., Inc.*, 159 Wn. App. 18, 28, 244 P.3d 438 (2010). A disability is "a sensory, mental, or physical impairment" which is (1) "medically cognizable or diagnosable," (2) "[e]xists as a record or history," or (3) [i]s perceived to exist whether or not it exists in fact." RCW 49.60.040(7)(a)(i)-(iii). "A disability exists . . . whether or not it limits the ability to work generally or work at a particular job." RCW 49.60.040(7)(b).

Here, medical records show and the City conceded Riley has a disability.

2. Substantial Evidence or a Reasonable Inference Existed for a Fair-Minded, Rational Person to Conclude the City Had a Duty to Accommodate Riley

The mere presence of a disability does not qualify an employee for an accommodation. Rather, the employer's duty to accommodate is triggered when the employer becomes aware of

the employee's disability and physical limitations. *Goodman*, 127 Wn.2d at 408-09. Therefore, to qualify for reasonable accommodations, the employee's impairment must be known to the employer or "shown through an interactive process to exist in fact" and (1) the impairment must substantially limit the employee's ability to perform his job, or (2) "[t]he employee must have put the employer on notice of the existence of an impairment, and medical documentation must establish a reasonable likelihood that engaging in job functions without an accommodation would aggravate the impairment to the extent it would create a substantially limiting effect."[14] RCW 49.60.040(7)(d)(i)-(ii).

Here, in the light most favorable to Riley, substantial evidence existed for a fair-minded, rational person to conclude that the City was aware of Riley's disability and his physical limitations. Dr. Seaholm wrote on at least twelve occasions that Riley's continued work in the fire garage would continue to result in dangerous blood pressure spikes and provided significant risk of myocardial infarction or stroke. These numerous letters from Dr. Seaholm, in addition to similar letters from Regala and Stephens provided sufficient evidence on which a rational person could conclude that if Riley engaged in his job duties without an accommodation, his health problems would have been aggravated "to the extent it would [have] create[d] a substantially limiting effect."

---

[14] RCW 49.60.040(7)(c) defines "impairment" as including:

> (i) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: Neurological, musculoskeletal, special sense organs, respiratory, including speech organs, cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine; or
> (ii) Any mental, developmental, traumatic, or psychological disorder, including but not limited to cognitive limitation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

RCW 49.60.040(7)(d)(ii). This is especially the case given that each time he was placed back into his work environment, he continued to experience blood pressure spikes requiring emergent transport to the hospital.

### i. Cooperation

The City argues that Riley did not cooperate in the interactive process and therefore, the City had no duty to accommodate him. I disagree, because viewing the facts in the light most favorable to Riley, substantial evidence or a reasonable inference existed to persuade a fair-minded rational person that Riley cooperated in the accommodations process, even if he appeared to be confused and later viewed his efforts as futile.

Riley stated that DLM conveyed to him that ADA accommodations did not cover his disability. Riley testified he was "confused about the whole situation" because

> the DLM department would refer me to HR. And then HR would say, but it's a medical condition because you're getting medically transported in your notes, so go back to DLM. And DLM was like, we can't help you; go back to HR. And it was back and forth the whole time. And it seemed like no one was really listening to each other or the issues at hand.

RP (May 16, 2023) at 331. Riley even directed DLM to work directly with his attorney because he "didn't understand the process." 9 RP at 1348.

Further, Riley engaged in extensive communication with his employer and with DLM regarding accommodations. He submitted two medical questionnaires that Dr. Seaholm and Regala provided. Dr. Seaholm also sent twelve letters that consistently specified Riley's health problems were due to his workplace conditions and that he needed to be moved elsewhere for his safety.

While Riley was inconsistent as to whether or not he requested reasonable accommodations through the ADA process, the communication from Riley and his treatment providers continued after he withdrew, then re-engaged with the accommodation process. There was at least one period of time, for example, in July 2019 when he requested to re-engage in the accommodations process, from which a fair-minded rational person could infer he was requesting ADA accommodations.

In July 2019, when Riley returned to the fire garage after his temporary assignment, Dr. Seaholm sent a letter stating, "[b]ecause [Riley] has had to return to the inciting work environment his ADA accommodations must be re-instated as previously specified." Ex. 202, at 010. Riley also testified that on July 19 he would have requested to re-engage in the accommodations process. It was not until January 2020 that Riley called DLM and left a voicemail stating he was not requesting a transfer under the ADA. However, even then, when Riley was asked if he was declining to engage in the accommodations process he stated:

> I'm not declining anything. I welcome any help I can get. But you have told me several times stress claims due to bullying and harassment are not covered under [ADA].

Ex. 202, at 016. Viewing the evidence in the light most favorable to Riley, a rational person could find that these exchanges suggest that Riley requested reasonable accommodations and only waivered in his request because the City confused him as to whether or not his disability was covered.

Further, the City's assertion that Riley needed to provide further information so it could determine what functions of the job Riley could not perform, does nothing to negate the substantial evidence or reasonable inference, in the light most favorable to Riley, that Riley was cooperating. Instead, it underscores the need for a jury determination. This is especially true given the evidence

contrary to the assertion that Riley needed to provide more information. For example, while the City asserted that it could not move forward with the accommodations process because it needed clarification as to what essential functions Riley could not perform, the City's own medical separation letter to Riley admitted that the essential function Riley could not perform was being in the fire garage.

The majority focuses on the fact that Riley did not return the second medical questionnaire and concludes that this "amounted to a failure to meet his obligation to provide medical documentation showing the nexus between his medical condition and the need for an accommodation." Maj. opinion at 22. But this conclusion fails to account for all the medical information that Riley submitted to the City, some of which was provided after re-engaging in July 2019.

The City's contention that it needed even more medical documentation informing it of the essential functions of the position that Riley could not perform does not conclude the matter. Rather, Riley's provision of numerous letters from his providers and his testimony that the City confused him about the process, amounts to substantial evidence or a reasonable inference from which a fair-minded rational person could conclude that the City had been provided enough information, or that Riley was confused by the City's conduct in repeated requests for information and referrals to the different departments; this is an issue for the jury, especially in light of the fact that the City acknowledged exactly which essential function Riley could not perform, rendering their request for information dubious. But again, this is a question for the jury.

The majority opinion also concludes that Riley was not confused despite his testimony, because the City clearly communicated that it needed updated medical questionnaires. But

whether Riley was in fact confused is for a jury to determine. His testimony that he was confused, in spite of the City's contention that it needed updated medical questionnaires, amounts to substantial evidence or a reasonable inference from which a fair-minded rational person could conclude the City had confused him. Again, this is a question for the jury.

And the majority appears to discount testimony by Riley's expert Dr. Blanck. I understand that reasons to doubt the credibility of Dr. Blanck's testimony can contribute to a reviewing court's determination of whether a fair-minded rational person would find in favor of the City. But in this case, I view the same testimony cited by the majority as creating a determination for a jury.

The majority references *Riehl v. Foodmaker, Inc.* in which the court held that a doctor's note stating that the employee had PTSD, that was sent five months after the employee's termination was insufficient to show a nexus between the employee's disability and his need for reasonable accommodations. 152 Wn.2d 138, 149 n.6, 94 P.3d 930 (2004), *abrogated on other grounds by Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas County*, 189 Wn.2d 516, 404 P.3d 464 (2017).

*Riehl* states that the requirement that the employee establish a nexus between the disability and need for accommodation "is not burdensome; it simply requires evidence in the record that a disability requires accommodation." *Id.* at 148.

> Competent evidence establishing a nexus between a disability and the need for accommodation will vary depending on how obvious or subtle the symptoms of the disability are. Medical expert testimony may or may not be required depending on the obviousness of the medical need for accommodation in the sound discretion of the court. Where the disability and need for accommodation is obvious, such as a broken leg, the medical necessity burden will be met upon notice to the employer, and the inquiry will not be if accommodation is needed, but rather what kind of accommodation is needed. However, in the case of depression or PTSD, a doctor's note may be necessary to satisfy the plaintiff's burden to show some accommodation is medically necessary. *Although a doctor may not be able to*

*prescribe a specific form of accommodation, a letter or note will provide a sufficient nexus between the disability and the need for accommodation.*

*Id.* (emphasis added).

In the light most favorable to Riley, Dr. Seaholm's letters can fairly be read to convey that the duty Riley could not perform was his job *in the fire garage*. Given the communicative efforts he and his providers undertook and the content of those letters, which in the light most favorable to Riley, repeatedly conveyed the need for an alternative work environment, in addition to Riley's testimony that he was confused, there exists substantial evidence or a reasonable inference from which a fair-minded rational person could conclude that Riley cooperated.

ii.      *Snyder* Does Not Bar Claim as a Matter of Law

The City argues *Snyder v. Medical Service Corp. of Eastern Washington*, 145 Wn.2d 233, 35 P.3d 1158 (2001), bars Riley's claim because his requested accommodation was new coworkers. I disagree. And this is a significant point because the City's conduct appears to derive from the notion that it need not accommodate a request for new coworkers for personality conflicts. While *Snyder* does speak to such circumstances, Riley's circumstance is different from that in *Snyder*.

In *Snyder*, a case manager was diagnosed with PTSD after several conflicts at work involving her "authoritarian" and "belligerent" supervisor, Hall. *Id.* at 237. She asked to report to a different supervisor or be transferred to another department, because her physician would not allow her to work under Hall. *Id.* at 237-38. Snyder took a job somewhere else and ultimately filed suit against her employer, alleging, among other things, that her employer failed to accommodate her disability. *Id.* at 239.

The *Snyder* court held that a claimant is not entitled to an accommodation "simply because she has a personality conflict with [a] supervisor." *Id.* at 241. Further, it established that an employer has no duty to accommodate an employee's disability by providing them with a new supervisor. *Id.* at 242.

Unlike Snyder, Riley did not simply have a personality conflict. Instead, a reasonable person could conclude he had significant objective and observable physical health problems in the form of dangerously high blood pressure spikes that stemmed from his mental health diagnosis. While these problems were exacerbated by conflicts in the workplace, a reasonable person could conclude they were present even outside of such interactions because Riley was transported to the hospital on a day the conflicting coworkers were not there. While Riley stated that his medical problems were exacerbated/caused by the *work conflicts* he experienced, substantial evidence or a reasonable inference exists for a fair-minded rational person to conclude he requested an accommodation because of his *medical disability*. Dr. Seaholm's letters requested that Riley be allowed a transfer, not because he could not get along with his coworkers, but rather to prevent a "disabling event." Ex. 202, at 012.

Riley's disability, doctor's notes, interactions with DLM and HR, and DLM's own medical questionnaire, all establish that Riley did not request to have new coworkers, which *Snyder* prohibits as being an unreasonable accommodation. Riley's providers' letters requesting that Riley be allowed an alternative work environment conveyed that due to the dangerous blood pressure spikes related to his mental health diagnosis, Riley could not work at that location. Riley's health care providers suggested "an alternative work environment," "a permanent transfer," or a "safe

and healthy" work environment, to prevent worsening of his health problems. Ex. 140, at 002; Ex. 175, at 006; Ex. 202, at 012, 014.

In the first medical questionnaire that DLM requested Riley's physicians complete, DLM stated that Riley requested to be "'somewhere else in the city that is [a] safe and healthy work environment.'" Ex. 136, at 002. Riley stated that he never requested his coworkers be removed, rather, he wanted to be "placed in a safe and healthy work environment." CP at 104.

Substantial evidence or a reasonable inference existed for a fair-minded rational person to conclude that Riley's impairment would substantially limit his ability to perform a duty of his job, namely work *at that location*, because one cannot perform their job if they are regularly being transported to the ER. Therefore, since Riley's claim was not based on mere personality conflicts but instead was based on objectively observable physical manifestations of a mental health diagnosis, and he did not request new coworkers, *Snyder* does not bar his claim.

iii.      Essential Functions of Job

The City argues that Riley was not entitled to an accommodation because he could perform all the essential functions of his job. I disagree.

Riley does not have to show that he could not perform the essential functions of the job. Rather, as explained above, he has to show that his impairment would "substantially limit[] . . . [his] ability to perform his . . . job" or that "medical documentation . . . establish[es] a reasonable likelihood that engaging in job functions without an accommodation would aggravate [his] impairment to the extent it would create a substantially limiting effect." RCW 49.60.040(7)(d)(i-ii).

Here, viewing the facts in the light most favorable to Riley, substantial evidence or a reasonable inference existed to persuade a fair-minded rational person that Riley's impairment would substantially limit his ability to perform his job, and medical documentation also established "a reasonable likelihood that engaging in job functions without an accommodation would aggravate [his] impairment to the extent it would create a substantially limiting effect." RCW 49.60.040(7)(d)(ii). While Riley's medical notes generally stated that Riley could perform his job functions, the notes conditioned his performance on his being "placed in an alternative work location." CP at 758. Dr. Seaholm's letters also cautioned that if Riley was placed back into the fire garage, he was at "risk of experiencing an acute cardiovascular event such as stroke or myocardial infarction." Ex. 175, at 008. These medical notes establish a reasonable likelihood that if Riley engaged in his job functions without an accommodation, his impairment would be aggravated such that it would create a "substantially limiting effect." RCW 49.60.040(7)(d)(i). This limiting effect was at least dangerously high blood pressure spikes, emergent transports to the hospital, and according to Dr. Seaholm could include stroke. Further, the City's own medical separation letter to Riley stated that he could not perform the essential functions of his job.

### iv. Qualified for Position

The City argues Riley failed to show there was a "preexisting vacant position for which he [was] qualified." Br. of Resp't at 55.

Insofar as Riley requested to be reassigned to a different position, he had to prove that he was "'qualified to fill a vacant position.'" *See Wilson*, 110 Wn. App. at 270 (quoting *Pulcino v. Fed. Express Corp.*, 141 Wn.2d 629, 639, 9 P.3d 787 (2000), *overruled in part by McClarty v. Totem Elec.*, 157 Wn.2d 214, 137 P.3d 844 (2006)).

Viewing the facts in the light most favorable to Riley, a fair-minded rational person could infer that Riley was qualified for the welding position he applied for. Dr. Blanck's testimony at trial that an employee who met minimum qualifications should get the job in conjunction with the e-mail Riley received from HR stating he "did pass minimum qualifications" amounted to sufficient evidence or a reasonable inference of qualification. Ex. 21A, at 3.

## ATTORNEY FEES

Riley requests attorney fees on appeal under RAP 18.1(a)-(b) and RCW 49.60.030(2). While RCW 49.60.030(2) allows for the recovery of attorney fees under chapter 49.60 RCW, since Riley's case has not been adjudicated, to award fees now would be premature. As such, I would remand for the trial court to determine if the award of attorney fees is appropriate at the conclusion of Riley's claim.

## CONCLUSION

I would reverse the dismissal of Riley's failure to accommodate claim and remand for a new trial. However, I would affirm the dismissal of Riley's intentional infliction of emotional distress and hostile work environment claims. I would also affirm the denial of Riley's motion in limine to exclude certain medical records. I would remand to the trial court for proceedings consistent with this dissent.



Veljacic, J.